## OGUS, RABINOVICH & OGUS CO. v. FOLEY BROS. DRY GOODS CO.
### (No. 431-3798.)

(Commission of Appeals of Texas, Section A. June 30, 1923.)

**1. Partnership ⬥8—Contract held to be a lease, and not contract of "partnership."**

A contract for the use of premises designated the relationship of its parties to be that of lessor and lessee, and gave the lessor control of the lessee's business only to the extent to enable the lessor to prevent interference with its own business situated in the same building and in part on the same floor. The lessor was to be paid a specified rental and a percentage on all net sales by the lessee, and was to furnish the lessee with certain clerks and other aid in carrying on trade. *Held*, that the contract was one of lease, and not of partnership.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Partnership.]

**2. Corporations ⬥639—Where, in action by domestic against foreign corporation, charter of neither was in evidence, court can only place on their powers such limitations as broadly apply to domestic corporations.**

In an action by a domestic corporation against a foreign corporation to recover unpaid lease money, where the charter of neither was in evidence, the court can only place upon their powers such limitations as broadly apply under the law to domestic corporations.

**3. Partnership ⬥17—Express declaration of partnership not necessary.**

An express declaration is not necessary to constitute parties to a contract partners if from the terms of the whole contract such relationship was established between them.

**4. Partnership ⬥8—Contract for rent held not to provide for sharing of profits by parties thereto; "net sales"; "net profits."**

A contract for the rent of premises, which provided that the lessee should pay the lessor an amount equal to a percentage of all net sales, was not one for the sharing of profits; the term "net sales" not being identical with "net profits."

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Net Sales; First and Second Series, Net Profits.]

**5. Partnership ⬥1—Tests to be applied in determining relationship between parties designated in contract as lessor and lessee stated.**

Where the parties to a contract designated their relationship as lessor and lessee, the tests to be applied to determine whether they were partners are whether the agreement created a community of interests between them, whether the business contemplated by the contract was a common enterprise, and whether it was operated for the joint account with the right in the owner of each interest to share as a principal in its profits as such.

**6. Corporations ⬥459—Contract of lease between two corporations held not ultra vires as to lessee.**

A contract of lease between two corporations, which provided that lessor should control the leased premises and the sale of lessee's goods so as to prevent interference with lessor's own business situated in the same building and in part on the same floor, was not ultra vires as to lessee because taking control of all its business, nor was it rendered ultra vires by provisions for furnishing lights, window space, and service to lessee.

**7. Landlord and tenant ⬥103(1)—Closing store a few days held not to authorize lessee of part of store to abandon contract of lease.**

Where a lessee of space in a store for sale of goods did not contract against the closing of the store, the closing of the store to prepare for a "change of firm" sale and for a holiday did not constitute a breach of the contract authorizing lessee to abandon the contract, in view of its diminishing business and its wish to have the contract canceled.

**8. Landlord and tenant ⬥172(2)—Use by landlord of abandoned window space held not an eviction of tenant.**

Where a tenant abandoned floor space leased in a store and window space, which would damage the landlord's business if allowed to be vacant, the use of the window space by the landlord during the remaining time of the lease did not amount to an eviction, actual or constructive, but rendered the landlord liable to account for the value of the use of the window.

**9. Appeal and error ⬥1013—Finding of trial court based on evidence conclusive on appeal.**

The finding of the trial court as to the value of window space used by a landlord after the abandonment of a lease by his tenant is binding on appeal.

**10. Landlord and tenant ⬥80(3)—Contract of owner of property with landlord forbidding sublease held no excuse for abandonment of lease by tenant.**

The fact that the contract of the owner of property with a landlord provided against a sublease gave a subtenant no right to abandon a lease, the provision being for the benefit of the owner.

Error to Court of Civil Appeals of First Supreme Judicial District.

Action by the Foley Bros. Dry Goods Company against Ogus, Rabinovich & Ogus Company. Judgment for plaintiff was affirmed by the Court of Civil Appeals (241 S. W. 267), and defendant brings error. Reformed and affirmed.

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Baker, Botts, Parker & Garwood, of Houston, for plaintiff in error.

Sam Streetman and Maurice Epstein, both of Houston, for defendant in error.

RANDOLPH, J. This suit was instituted by defendant in error in the district court of Harris county against the plaintiff in error to recover unpaid lease money upon an alleged lease contract.

The parties will be hereinafter designated as in the trial court.

Judgment was rendered by the trial court in favor of plaintiff as prayed for, and this judgment was affirmed by the Court of Civil Appeals. 241 S. W. 267.

The contract upon which the suit is based is as follows:

"This agreement made and entered into in duplicate this fourth day of November, A. D., 1913, by and between Foley Bros. Dry Goods Company, a corporation organized and existing under the laws of the state of Texas, and doing business in the city of Houston, lessor, and Ogus, Rabinovich & Ogus Company, a corporation, organized and existing under the laws of the state of Illinois, lessee, witnesseth:

"(1) The said lessor has this date demised and leased to the lessee and given it the sole and exclusive privilege for the purpose of conducting therein a department for the sale at retail of ladies', misses' and children's millinery and all its by-products a space of about square feet on the second floor of its building in the            as per blueprint attached hereto and marked 'Exhibit A' and additional space for workroom and stockroom on third floor, as per blueprint attached hereto and marked 'Exhibit B'; provided lessors reserve the right to sell baby caps, velvet, ribbons, ornaments and other merchandise as is now usually and customarily sold in other departments of their store.

"(2) In addition to the premises hereby leased, the said lessee shall also have the right to use a space of at least ten (10) feet window frontage on Main street for displaying its wares and shall also have the right to display hats on models and figures in all of the show windows at the discretion and direction of the lessor.

"(3) The term of this lease shall be for a period of five (5) years beginning January 1st, 1914, and ending December 31st, 1918.

"(4) The lessee in consideration of the premises hereby leased, agrees to pay to the lessor an amount equal to fifteen (15) per cent. on all net sales made by the lessee on above premises, and further agrees that the minimum rental so paid to the lessor shall be no less than ten thousand five hundred ($10,500.00) dollars per annum, payable in twelve (12) equal monthly installments. Should the business of the lessee during any fiscal year exceed the sum of seventy thousand ($70,000.00) dollars the lessee agrees to pay the lessor fifteen (15) per cent. on all such business above seventy thousand ($70,000.00) dollars which shall be deducted by the lessor in the monthly settlement whenever such sales shall have reached said sum of $70,000.00 during any one year.

"(5) The lessee further agrees that it will advertise its goods to the extent of at least four (4%) per cent. of its sales during each fiscal year, and during the entire time and term of this agreement. All advertising by the lessee of its wares and merchandise shall be made under the name of the lessor only. The lessee shall be chargeable with and pay monthly for all its advertising at absolute net cost to the lessor. When advertising jointly with lessor, the lessee will pay its pro rata share of head lines. Lessee shall pay its proportionate share on special advertising contracts, such as premium stamps, refunded railroad fare to customers, newspaper contests, etc., that may be entered into by lessor.

"(6) The lessor further shall provide all the necessary lighting for the proper conduct of the business of the lessee, also furnish all lights for window display, show cases, workrooms and stockrooms.

"(7) The lessor shall furnish heat and elevator service, freight and passenger, for the premises hereby leased to the lessee in the proper manner, and suitable for the conducting of the business of lessee, as same is now furnished, but in the event there shall be any breakage or any other cause for which said lessor is not responsible, whereby such heat or elevator service cannot be furnished, such failure to furnish heat or elevator service shall not operate as a breach of this contract, or render the lessor liable in damages to the lessee:

"(8) It is further understood between the parties hereto that in case of any controversy between lessee or its employees with customers, such controversies shall be referred at once to said lessor, or its officers, whose decision in the premises shall be final, and that under this provision, the lessor is authorized by lessee to refund money or to make allowances to customers of lessee, and to adjust the aforesaid controversies in any reasonable manner.

"(9) The lessee agrees that its employees shall abide by and conform to the rules and regulations which may from time to time be fixed and established by the lessor for the government of its own employees, and the said lessee shall not at any time make any rules or regulations for its employees which shall be in conflict with the rules and regulations of the lessor.

"(10) Said lessor further agrees to furnish janitor and porter service to maintain the premises hereby leased in proper and first class form, shape and condition.

"(11) The lessor agrees to furnish and pay for all water to be used by said lessee for the proper conduct of its business.

"(12) The lessor shall receive all merchandise sent by freight or consigned to the said lessee, provided such merchandise indicates by its marks that it is intended for the lessee. It is understood, however, that the lessee shall pay all of the freight, express and drayage charges on said merchandise.

"(13) The lessor agrees to provide the lessee without extra charge therefor, wrapping and tissue paper and twine, sales checks in triplicate, all printed forms used by lessor in its other departments, all stationery, telephone service, advertising service, window trimmer service, wrapping girls and cashier, but all

boxes, paper bags and out of town telephone calls shall be provided by the lessee at its own expense. The location of the wrapping station and cashier's desk to be situated in the millinery department or in some other convenient part of lessor's store, at lessor's discretion.

"(14) The lessee shall employ its own assistants and clerks, at its own expense ,and under its own contract, except wrapping girls and cashier, as provided in paragraph thirteen, above.

"(15) Said lessor shall deliver free of charge all wares and merchandise sold to ,customers by the lessee, in Houston or its suburbs where the general city deliveries of lessor now reach. All parcel post charges and express charges on sales made by lessee shall be paid by lessee.

"(16) Each of the parties hereto shall at all times use its best efforts to further the interest of the other party, and will endeavor, so far as it can, to have its employees work to this end.

"(17) The time for opening and closing the business carried on as herein contemplated, shall be controlled by the rules and regulations of the said lessor, and the giving out and control of the keys shall be governed exclusively by the said lessor.

"(18) The business of which this contract is the subject shall be conducted under the name and style of the lessor. The lessee agrees that it will advertise its business only under the name of Foley Bros. Dry Goods Company and that all signs placed in said building of lessor shall bear the name of Foley Bros. Dry Goods Company, only, that all bills for goods sold shall be issued in the name of the lessor only, and all wrapping paper, boxes and paper bags shall bear the name of the lessor only, and none other, and all communications of every kind addressed to customers shall be in the name of Foley Bros. Dry Goods Company, and none other.

"(19) All charge sales must be approved by lessor at its discretion and treated as a cash sale for the purpose of settlement with lessee.

"(20) All the moneys received by the lessee in the sale of its merchandise shall be paid at the time of sale to the cashier of lessor, who shall keep a full, true and complete record, open and available to lessee of all such receipts. The lessor agrees to disburse by voucher of lessee only, or lessee's properly appointed executive, all expenses necessary for the conduct of the business of the lessee, and lessor, upon deducting all such disbursements and the one-twelfth (1/12) part of the said sum of ten thousand five hundred ($10,500.00) dollars for rent and the percentage of sales, if any, above the sum of $70,000.00 for any one year and dll other expenses, shall pay to the lessee at Houston, Texas, the remaining balance, on or before the fifteenth (15th) day of each month for all sales made during the preceding month. Settlement to be made either in New York or Chicago exchange.

"(21) It is understood and agreed between the parties hereto that all personal property upon said premises belonging to the said lessee shall be at the risk of the lessee, and lessor shall not be liable to the lessee for any loss or damage to any of the personal property, or damage to any person or persons on or about the premises, ordinary care excepted, and the said lessee agrees to hold the said lessor harmless of any claim that may be made by any person by reason of any act or acts of the lessee, its agents or employees.

"(22) The lessor agrees to keep the walls, ceiling and floor of the said premises, in good repair and condition during the term of this agreement, and lessor further agrees to furnish, when necessary, the proper electric fans and fan service for lessee's department.

"(23) In the event that the store of the lessor, or that portion of it set apart for the use of the millinery department be totally destroyed by fire, or in the event of its being so damaged by fire or other casualty as to become unfit for the purposes of the business provided for, this agreement shall thereupon terminate, but in the event of a partial destruction or damage by fire or other casualty. the lessor may repair such damage within sixty (60) days from the date of such fire or other casualty, and shall credit the lessee upon accounting with a sum equal to the proportion that the period covered by the casualty bears to one year, on the basis of the minimum compensation of ten thousand, five hundred ($10,500.00) dollars per annum.

"In the event of the lessor's failure to repair such damage within sixty (60) days from such fire or other casualty, this agreement may be terminated by the lessee, at its option.

"(24) The lessee shall have the right to use the present fixtures now located in the millinery department, and may, if it so desires, remodel the same at its own expense, and may place new fixtures in said millinery department, but all such new fixtures shall be paid for and owned by the lessee subject to the conditions of the lease on the building occupied by the millinery department.

"(25) In the event the lease on the property in which the millinery department is now located cannot be renewed by the lessor, then the lessor agrees to give the lessee all of the third floor of their Main street building as space for such millinery department, except the space now used for the corset department and general offices, and lessor shall pay expense of moving said millinery department, it being understood that said lease expires on the 30th day of June, 1915.

"(26) The lessee agrees and binds itself to purchase from the lessor all the stock in the millinery department of the Foley Bros. Dry Goods Company, on a basis of sixty-six and two-thirds (66⅔%) per cent. of cost, stock to be taken on the first day of January, 1914, and payments to be made for said stock as soon as the amount of stock is ascertained and the cost thereof.

"(27) This agreement is made conditional upon the present lease held by lessor upon their store buildings, and in the event said lease is terminated by some cause beyond the control of lessor, then this contract shall likewise terminate.

"(28) In the event of any dispute between the lessor and lessee's local manager, the lessee agrees to remedy such disputed matter, provided, however, that lessor gives lessee thirty (30) days notice in writing to do so.

"(29) In the event the lessee shall remove or discard the present fixtures in the millinery department, as provided in paragraph 24, above, then the lessee agrees to replace the

fixtures so removed or discarded at the expiration of this lease."

The parties to this contract operated under it until September 29, 1917. The defendant's business, as shown by the evidence, had diminished from year to year, and, in the words of one of the witnesses, they found that they were "bleeding to death," and defendant in January, 1917, approached plaintiff for the purpose of securing the cancellation of the contract. This the plaintiff refused to do, and the business was continued, as stated, until September 29, 1917, at which time the defendants, for reasons alleged in their correspondence, declared the contract terminated and moved their stock from plaintiff's premises.

There are many facts and findings of fact by the trial court and Court of Civil Appeals that enter largely into the solution of the questions hereinafter passed on, and of such facts and findings of fact such recitals will be made as are necessary to an explanation of our ruling, and we will therefore attempt no further detailed statement at this time.

[1] The first error assigned in the application for writ is that the Court of Civil Appeals erred in holding that the contract in question lacked the essential elements of a partnership because the contract as a matter of law created a partnership between two corporations with limited powers.

Supporting this contention defendant urges that there was a sharing of profits provided by the contract, which, taken with the other conditions and terms of the contract, created a partnership relation between plaintiff and defendant.

[2] The charter of neither corporation was in evidence, but that plaintiff was a domestic and the defendant a foreign corporation were admitted facts; hence we do not know what limitations upon the business purposes of their incorporation were contained in the charters and can only place upon their powers such limitations as broadly apply under our law to domestic corporations. James v. James, 81 Tex. 381, 16 S. W. 1087.

[3] It not being the expressed intention of the parties to the contract to form a partnership, it remains to be determined whether or not the contract as entered into—whether or not the things provided to be done in the contract—as a matter of law, constitute them partners, as it is not necessary for such express declaration to be made if it appears from the terms of the whole contract that such relationship was established between them. Freeman v. Huttig Sash & Door Co., 105 Tex. 571, 153 S. W. 122, Ann. Cas. 1916E, 446.

[4] Defendant's contention that the contract provided for a sharing of the profits between the parties to it is not sustained by the language of that instrument. The contention is also made by defendant that, even though the contract does not use the word "profits," it does provide for the payment of 15 per cent. of the net sales above $70,000. There is no explanation as to what the parties meant by "net sales," and we cannot concede that the use of the term "net sales" is identical with "net profits." We can easily conceive of a case where there might be very large net sales and no profits at all. In our opinion the provision as to net sales is only a method provided between the parties to determine any increase in rental values. But be this as it may, the language of the contract is more definite and certain than the interpretation given it by the defendant. The exact language of the contract is:

"The lessee in consideration of the premises hereby leased agrees to pay the lessor an amount equal to 15 per cent. on all net sales, etc."

It has been expressly held by our Supreme Court that this language does not import a sharing of profits as such, even if we concede that the use of the words "net sales" is tantamount to "net profits." Buzard v. Bank of Greenville, 67 Tex. 88, 2 S. W. 54, 60 Am. Rep. 7. It is true that this holding is made as between an alleged partnership and third parties, creditors; but we can see no reason why it should not apply as between the parties themselves in testing their relationship.

[5] The parties to the contract in controversy having designated, in terms, their relationship to be lessor and lessee—landlord and tenant—the tests to be applied to determine their relationship in law are: By their agreement was there a community of interests between them; was the business a common enterprise; was it operated for the joint account with the right in the owner of each interest to share as a principal in its profits as such? Freeman v. Huttig Sash & Door Co., supra.

The Commission of Appeals, Section A, in an able opinion by Judge Taylor, in the case of Fink et al. v. Brown, 215 S. W. 846, reviews the Texas decisions at some length and, on the question as to whether a sharing of the profits creates a partnership, arrives at the following conclusion:

"Considered in connection with the other provisions of the contract showing that the relationship of lessor and lessees were thereby intended and constituted, it (sharing of profits) is not sufficient to raise a presumption of partnership."

[6] The defendant raised the question that there was a merger of the defendant's identity with that of the plaintiff and that plaintiff took under control all of defendant's business, and for those reasons the contract was ultra vires.

We do not agree that this proposition is correct. The requirements of the contract

were only such as would enable the plaintiff to so control the situation as to prevent interference with its own business situated in the same building and in part on the same floor. A rigid application of the rule insisted on by the defendant would even prohibit the sale of goods on consignment. It has never been questioned that a corporation has the right to enter into a contract with another person or corporation whereby its goods may be placed on sale on consignment with the other person or corporation. In that case, ordinarily, the consignee has the absolute control of the building and goods, and the consigning corporation may not be known in the transaction except that it must be paid for the goods consigned on their sale.

There is no valid reason why the contract should be held ultra vires because of the provisions for lights, window space, and service. We take it that these provisions arose by reason of the necessities of the parties under the lease and need no argument to sustain them.

We therefore hold that the contract in controversy is a contract of lease, and not a partnership, and that as entered into it is not ultra vires.

[7] The defendant assigns as error in its third assignment the holding of the Court of Civil Appeals that the defendant was bound to have known, when it entered into the contract with plaintiff, that the corporate name might be changed and that the advertised intention to at some time change its name, and that the closing of the store in September, 1917, by the plaintiff to the purchasing public, without the consent of defendant, and the act of the plaintiff in conducting its "change of firm sale" during that month, resulting in the sales of defendant amounting to nothing, did not constitute a breach of the contract by plaintiff and did not justify the defendant in its refusal to continue the performance of the contract.

As stated above, during this rental period the defendant's business had diminished until it amounted only to the sum of rent it had to pay for the year's rental for the last year it was in possession, and it was anxious to get out from under the liability of the contract. The sum of its annual decrease of business cannot be accounted for by the loss of a few days' business. As there was no apparent intention on the part of plaintiff to evict defendant (Underhill on Landlord and Tenant, § 673), in the absence of such intention, if defendant suffered any loss or damage, it would have been easily compensated in damages without its abandonment of the contract. However, it appears that the closing of the business establishment on one occasion was coincident with Labor Day, and also a Jewish holiday, which combined holiday, was, with Hebrew thrift, taken advantage of by plaintiff. Upon another occasion it is claimed that the store was closed for a preparation for a "change of firm sale" and that for several days the defendant was unable to transact any business because it had no goods to sell at reduced prices and therefore could not participate in the business.

We understand that such sales are annually or semiannually indulged in by parties engaged in the dry goods and clothing business in order that, by exciting the public interest, they may dispose of such goods as are likely to remain on their hands from the ordinary course of trade. The defendant made no provision for protection against this act of plaintiff by any term of the contract, and the evidence does not satisfactorily disclose that they actually suffered any material loss in the week's sales. The same can be said as to the advertised intention to change the "firm" name. In this respect, it is not shown that this was ever consummated, and the name of the corporation changed.

Taking into consideration the fact of its fast diminishing business and its efforts to have the contract canceled, we think that the record satisfactorily discloses that these trivial acts of plaintiff were not the moving cause of defendant's abandoning the contract, and we do not think they justified defendant in so doing.

[8] The fourth assignment of error complains of the ruling of the Court of Civil Appeals in holding that the use by plaintiff of the space reserved for defendant in the show window would not constitute a re-entry of the leased premises and would not create liability on the part of the plaintiff. The evidence discloses that when defendant abandoned the leased premises, the plaintiff kept vacant the floor space until the lease period expired, but took possession of the window space and proceeded to use it during the balance of the rental period. It being found as a fact by the Court of Civil Appeals that the leaving of the window space vacant was injurious to plaintiff's business, that court then held on this finding that the taking possession of and using such space by defendant created no liability on its part. This we think was erroneous. While the plaintiff was entitled to protect itself against loss, and was thus excused for taking possession of said window space, it was also chargeable with the benefit received. We do not intend to hold that plaintiff's use of this space was a re-entry, actual or constructive. The reservation of the lease floor space for defendant's use for the rental period and the taking possession of the window space for its own protection does not betray an intention to re-enter the premises and does not amount to an eviction, actual or constructive. However, the trial court found that—

"The value of that portion of the front window space which the defendant had the right to use in addition to the premises leased was $200.00 per month."

[9] This finding, being based upon evidence, is conclusive on us. If it was of that value for advertising purposes, it had such value to any one who used it, and the plaintiff having occupied and used it, whatever the excuse or reasons for so doing, received the benefit therefrom and must account to the defendant for it. Massie v. Bank, 11 Tex. Civ. App. 280, 32 S. W. 797; Robinson Seed & Plant Co. v. Hexter & Kramer (Tex. Civ. App.) 167 S. W. 749; Miller & Bro. v. Nigro (Tex. Civ. App.) 230 S. W. 513.

[10] Nor can we sustain the defendant's contention that because of the provision against sublease in the contract of the owner of the property with plaintiff, this in any way gave defendant a right to abandon the contract. Its possession had not been interfered with by the landlord. It was a provision for her protection, and as she never attempted to enforce it, defendant has no right to complain. Sexton v. Chicago Storage Co., 129 Ill. 318, 21 N. E. 923, 16 Am. St. Rep. 274. In addition, defendant never, at any time prior to its abandonment of the contract, urged this as one of the reasons for its breaching the contract.

We have carefully considered the remaining assignments of error presented in the application, and finding no reversible error, we overrule them.

We therefore recommend to the Supreme Court that the judgments of the trial court and the Court of Civil Appeals be modified by crediting the judgment rendered in the trial court with the sum of $3,000, being the aggregate of the value of the window space used by plaintiff for 15 months at $200 per month, to be credited as of date of 30th day of April, 1920, and as thus modified that such judgments be affirmed.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reformed so as to reduce the judgment by the amount of $3,000 to be credited as of date April 30, 1920; and, as reformed, the judgments are affirmed.