**J. ROBERT NEAL, INC., Appellant,**

v.

**H. O. McELVEEN, D/B/A Capitol Butane Rig Service et al., Appellees.**

**No. 13355.**

Court of Civil Appeals of Texas.

Houston.

Jan. 8, 1959.

Rehearing Denied Jan. 29, 1959.

. Richard Millan, Painter, Painter & Cook, W. Lawrence Cook, Jr., Houston, for appellant.

Joe H. Reynolds, William Key Wilde, Houston, Bracewell, Reynolds & Patterson, Houston, of counsel, for appellees.

WOODRUFF, Justice.

Appellee, H. O. McElveen, sued Petroleum Drilling Corporation and J. Robert Neal, Inc., on an account. From a joint and several judgment rendered against them for $2,589.27, being the amount of the account, interest and $250 attorney's fees, J. Robert Neal, Inc., appealed.

The account sued on was for butane gas furnished to Petroleum Drilling Corporation and used in operating a drilling rig owned by that corporation. It was

appellees' contention that J. Robert Neal, Inc., was a partner of Petroleum Drilling Corporation, or, in the alternative, it was estopped to deny a partnership. Appellant, by a sworn plea, denied the account, the partnership, and that it ever held itself out as a partner.

Pursuant to special issues submitted to the jury, findings were made that appellant was a partner with Petroleum Drilling Corporation; that it conducted its business so as to hold itself out as a partner with Petroleum Drilling Corporation; that appellee believed J. Robert Neal, Inc. was a partner; that appellee relied on the conduct of J. Robert Neal, Inc. that it was such a partner; and that a reasonably prudent person would have believed that J. Robert Neal, Inc. was a partner. Pursuant to these findings, the trial court rendered the judgment appealed from. No contest was offered as to the amount of the account.

Appellant predicates its appeal upon three points: First, in overruling its motion for judgment non obstante veredicto; Second, in entering judgment on the verdict, there being no evidence to support it; and Third, in the alternative, the evidence was insufficient to support the verdict.

The proof showed that shortly before March 15, 1955, J. Robert Neal, Inc., acquired certain oil and gas leasehold interests under a "farm-out" agreement with Shell Oil Company. Thereafter it entered into a written contract with Petroleum Drilling Corporation to drill a well, hereinafter referred to as Pipkin No. 1, whereby Petroleum Drilling Corporation contracted to drill the well "at its sole cost, risk, expense, and liability" for the contract price of $50,560.40. The well was completed as a dry hole and the full amount of the contract price, plus an over-payment of $92.31, was paid to and for the account of Petroleum Drilling Corporation by appellant.

Hereinafter Petroleum Drilling Corporation will generally be referred to as "Petroleum"; J. Robert Neal, Inc. as "Neal, Inc.", and J. Robert Neal as "Neal." The only witnesses were appellee H. O. McElveen and Quinn Rasberry, appellant's secretary and accountant.

Appellee testified that beginning in December, 1954, and continuing until about April 9, 1955, at the request of Frank McCullough, Petroleum's drilling superintendent, and J. H. English, its tool pusher, it furnished butane gas to Petroleum's drilling rigs at various locations. He told McCullough he would do so provided he received a check on each delivery. At times he had to go to Petroleum's offices in the Electric Building in Houston to get the checks. On the first well near Rosenberg, known as "The Moore", English told appellee it was "a J. Robert Neal job." Appellee never talked to appellant about the job. In March, 1955, he delivered gas in Jackson County to the "Williams" well. English ordered it and, at his discretion, the delivery tickets were made out to "J. Robert Neal, Inc." The charge therefor was $36.40 and was an item in suit. Thereafter appellee sold gas on a well in South Houston, for which Petroleum was billed. This item was paid. English was the tool pusher and McCullough was superintendent of all these jobs.

The remainder of the account sued on totaled $2,042.95. It was evidenced by 15 delivery tickets made out to Petroleum showing deliveries of butane gas to Pipkin No. 1 job in Jefferson County between March 9 and April 6, 1955. The gas was ordered by McCullough and 4 of the tickets were signed by English. Appellee testified that McCullough told him on these jobs that it was a J. Robert Neal; that Neal was in good shape and that he, appellee, would get his money.

After the jobs were finished and sometime between April 9 and 14, 1955, appellee went to Petroleum's offices in the Electric Building to collect his account. He saw Neal there. That was the first time he ever saw or talked to Neal. On the door was "Petroleum Drilling Company"; and it was the offices of Petroleum. Neal's

name was not on the door; he had received payment from Petroleum there before; he didn't know how he came to see Neal; he was in a back office; appellee didn't know whose office. Appellee asked Neal for payment. Neal said he couldn't pay it right then. Appellee said he was going to file suit; Neal said if he did he may not get it; it would be a long time, but he would pay it if he didn't file on him. Appellee "made it plain * * * that he was going to sue J. Robert Neal" and Neal replied he "thought he could pay it" but if appellee sued he doubted if appellee would "ever get the money * * *" Appellee did not have the invoices with him. They had been sent to Petroleum. He did not tell Neal that this was a bill that was invoiced to Petroleum. On April 14, 1955, appellee filed suit. Appellee also testified that he had never been in the offices of Neal if those were not his offices in the Electric Building. Those statements billed to J. Robert Neal were sent to that office. He also testified that when he was requested by McCullough to make deliveries that was his reason for doing so and that he didn't make a careful investigation as to whether J. Robert Neal would be responsible therefor or not.

On cross-examination he was asked: "That is, in effect, the only thing you relied on was the statement by McCullough that we have already discussed here. Is that right?" Appellee answered: "Yes."

It was also shown that Elias Gatoura had an office with a common reception room with Petroleum. They each had their own secretary. Gatoura was an attorney and represented J. Robert Neal, Inc. during the period involved. He was also a vice president. Possibly he signed the contract in its behalf with Shell Oil Company under the express directions of Neal. However, Gatoura owned no stock in the corporation and it is not shown that appellee ever saw him, knew who he was, or that he was in anywise connected with appellant. Nor is it shown that Gatoura ever saw appellee or had any knowledge of Petroleum's dealings with appellee. At the time of the trial Gatoura was neither an officer nor the attorney for Neal, Inc.

Quinn Rasberry, appellant's secretary and accountant since 1953, was initially called to testify by appellee. He said J. Robert Neal, Inc. was a corporation. Neal was its president, Elias Gatoura its vice president, and he was its secretary; that Neal and he, Rasberry, owned all of the stock; Gatoura owned none. Neal was in Houston occasionally in 1954, but spent six or eight months here in the first part of 1955 because of drilling commitments. He had no interest in any Jackson County wells during that time. He did have "an interest" in a well near Rosenberg; Petroleum was the sub-contractor that drilled the well; the same was true of Pipkin No. 1 in Jefferson County. Neither he nor Neal, Inc., however, had any interest in a well in either South Houston or Jackson County during that period. He said he and Gatoura in 1954 had the responsibility for managing Neal, Inc. under Neal's supervision by telephone. They executed contracts for Neal, Inc. when so directed by Neal. Neal, Inc. was also interested in two wells in Orange County and one in Jefferson County. One of the wells in Orange County had already been drilled and one was going down at the same time as the Pipkin. The second well in Jefferson County, the "McFaddin No. 1", was drilled after the Pipkin. McCullough was drilling superintendent on the Pipkin, but not on the McFaddin although he was in charge of moving the rig from the Pipkin location to the McFaddin site.

Neal owned no stock in Petroleum in 1954 or 1955, although he had owned some until February, 1953. Rasberry was an accountant who did some audit work for Petroleum before 1953. He did no work for Neal at that time, although Neal, Inc. was then incorporated. Petroleum was in the business of drilling oil wells. Neal, Inc. was in the business of acquiring contracts and farm-outs. In February, 1953, Neal sold his stock in Petroleum and had

no further connection with Petroleum after that date. Petroleum had their offices in the Neal Building, but when Neal sold his stock in February, 1953, they moved to the San Jacinto Building. Later Petroleum moved to the Electric Building. There was never any common offices between Petroleum and Neal, Inc. Neal, Inc. had been in the Robert Neal Building since 1952. He testified that Petroleum did drill the Rosenberg and Pipkin wells. Rasberry had no knowledge of the manner and method Petroleum used in ordering materials for the drilling of the wells. Petroleum owned the rig; it was not financed by Neal, Inc.; Neal, personally, had a mortgage on it. Immediately after the completion of Pipkin, Neal took possession of the rig and it was used on the McFaddin. Rasberry testified he had nothing to do with the Rosenberg or Pipkin wells as a drilling contractor and that he did not go to the location to observe the wells before completion. He did not know whether English was ever an employee of Neal, Inc.; McCullough moved the rig from Pipkin No. 1 to McFaddin No. 1 for Neal, personally, and not Neal, Inc. However, he was never the drilling superintendent on the McFaddin well.

Rasberry further testified that Neal owned the mortgage personally. He had sold the rig to Petroleum in February, 1953, and had never been paid therefor when he took it over after the Pipkin was completed. Rasberry further testified that he was the bookkeeper for Neal and Neal, Inc. and that he never received any invoices on the Rosenberg job, nor did he ever receive any invoices from McElveen. He stated, too, that none would have been sent to Gatoura, they would have been sent to him as secretary. Neither did he know that anyone represented that they were purchasing any materials for Neal, Inc. in December, 1954, and the spring of 1955; nor did he have it come to his attention that anyone, including the superintendent or tool pusher, was representing to suppliers in the drilling of the Rosenberg or Jefferson County wells "that J. Robert Neal, Inc. and Pe-

troleum were one and the same outfit" until after the wells were completed. He said he knew that Petroleum had trouble getting funds to make their payroll and that their credit was limited.

After the wells were completed he found out that representations had been made by the drilling superintendent and tool pusher "that J. Robert Neal had some interest in these wells." He did not go to the well sites in Rosenberg or the Pipkin until they were completed. Neither did Gatoura ever tell him that any such representations were being made. Neither did Neal make any inspection of the wells until he, Rasberry, went down there. They were relying entirely upon Petroleum under the terms of their contract to do the job. He further testified that he couldn't account for the South Houston delivery tickets because they never had a well there.

Under further questioning he said Neal sold all his stock in Petroleum in 1953 and was no longer an officer after that date. That was when Rasberry left Petroleum and went with Neal. He had no connection thereafter with Petroleum. It was almost two years later in December, 1954, before they had any contract or dealings with Petroleum. He testified, too, that in February, 1953, Neal personally owned the drilling rig in question and that he sold it to Petroleum, taking a mortgage for part of the purchase price; that Petroleum had had possession of the rig during the intervening time and had not paid for it; that the first dealings they had with Petroleum after February, 1953, was the Rosenberg job which was a contract to drill a well— a turn-key contract. The Pipkin well was also drilled under a contract. This contract was offered in evidence. It provided for the drilling of the well by Petroleum Drilling Company, as heretofore stated, for $50,560.40. It was a turn-key contract. It contained a provision that permitted appellant to furnish supplies or to pay suppliers and deduct such amounts so furnished or paid from the contract price. It was shown that by mutual agreement be-

tween Neal, Inc. and Petroleum the surface casing was furnished by appellee and the agreed price therefor was deducted from the contract price in the final settlement. Rasberry testified that during the progress of the job some 8 or 10 suppliers contacted him and before furnishing any materials or services obtained from him an agreement that Neal, Inc. would pay them direct. Those named included the firms which furnished drilling mud, lumber, cement and shell. These amounts aggregated $20,992.75. Advances to Petroleum of money were also made on the contract, including several items to meet its payrolls. All of these amounts were deducted from the contract price in making the settlement with Petroleum. In fact, there was an overpayment of $92.31 due to their inability through a series of transactions to determine each amount "right down to the last penny."

In explaining how the arrangements with suppliers were made, Rasberry testified he entered into the agreements himself. Gatoura did not. Mr. Paul, secretary of Petroleum, would call him that he needed certain supplies and he, Rasberry, would tell Paul to have the suppliers get in touch with him, Rasberry. He told them to get in touch with him before they delivered anything and he gave them an O. K. on it, and to send the invoices directly to his office. They were made out to "J. Robt. Neal, Inc." No invoices were ever sent in for payment that were made to Petroleum Drilling Company. The invoices were sent directly to him. No one else was authorized to act in this capacity in his absence.

It was undisputed in the record that appellee never contacted or requested authority from Rasberry for the delivery of butane gas.

█ In testing the sufficiency of this evidence to support the verdict, we must view it in the light most favorable to appellee and indulge every reasonable inference that may be drawn therefrom in its favor. However, the verified denial of partnership filed by appellant placed the burden of proof upon appellee and it was necessary that he go further than to furnish mere surmise or suspicion that a partnership relation existed. Bolding v. Camp, Tex.Com.App., 6 S.W.2d 94; Joske v. Irvine, 91 Tex. 574, 582, 44 S.W. 1059.

Appellee has cited Bolding v. Camp, supra, in support of his position in this case. We fail to see how appellee finds any support in that holding. There the sole question was whether a partnership was established by the proof as a matter of law. It was shown that Bolding (against whom the status of a partner was sought to be proved) was present on several occasions while the wells were being drilled, and on one occasion stated to the supplier who sued that he had an interest in the well. True it was that his interest was only an ownership of a 1/16th interest in a certain 15 acre lease upon which the wells were drilled. For this he had paid a fixed amount. The Commission of Appeals held, in reversing the trial court and Court of Civil Appeals, 296 S.W. 1116, that no partnership was established although the letter under which Bolding claimed his interest described the property conveyed as a 1/16th interest in the mineral lease "with a well thereon."

It should be observed that there was no plea of estoppel in that case. However, the element of a person's holding himself out as a partner was considered insofar as it bore on the issue of partnership. The court simply held that as a matter of law no partnership relation was established by the written assignment and Bolding's acts and pretermitted any discussion of the sufficiency of proof to raise the issue of an estoppel.

█ The contract under consideration here is in the customary form commonly referred to in the oil industry as a "turnkey contract." Petroleum contracted to drill the well to a certain depth "at its sole cost, risk, expense and liability" for

the fixed contract price, which Neal, Inc. agreed to pay. It contained a clause, the gist of which we have heretofore set forth, permitting Neal, Inc. to make certain payments to suppliers and deduct such amounts from the contract price. It also provided that appellant could make deductions for · any materials that it furnished Petroleum on the job which, in this instance, was the surface casing which Neal, Inc. had available. We see no reason why advancement on the contract price could not be made by appellant to Petroleum as the job progressed if it chose to do so. The only proof of the advancements and the arrangement which was made in each instance with suppliers who required it came from Rasberry, one of appellant's officers. There is no proof to the contrary. Under the terms of the contract and the proof of the manner in which it was carried out, there is no evidence whatever that there was a joining between appellant and Petroleum in a common business to be operated for their joint account in which each as owner had an interest which would entitle them to share as principals in the profits. These elements are essential to establish a partnership relation. Fink v. Brown, Tex.Com.App., 215 S.W. 846; Burk Burnett-Mann Oil Co. v. Robertson, Tex.Civ. App., 240 S.W. 1046.

██ Nor can it be said that the conversation between appellee and Neal that took place in the office of Petroleum on April 9, 1955, after the account had accrued, would convert the relationship between Petroleum and Neal, Inc. into that of a partnership. When appellee said he was going to file suit on him, Neal told him if he did not do so he would be paid; that it would be a long time. But if he did file suit, Neal said he didn't know if he, appellee, would get it or not. This language, in our opinion, cannot be construed so as to evidence a partnership relation between Petroleum and Neal, Inc. Neal spoke in his own behalf because, as appellee testified, he made it plain that he was going to sue "J. Robert Neal." Cer-

tainly, it does not in anywise show that essential element of a sharing of the profits and losses, which is wholly lacking in this case. Ogus, Rabinovich & Ogus Co. v. Foley Bros. Dry Goods Co., Tex.Civ.App., 241 S.W. 267, affirmed Tex.Com.App., 252 S.W. 1048. Moreover, at the time these events occurred it was the settled law in this State that a corporation could not enter into a partnership, such action being contrary ,to public policy. Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716; Sabine Tram Co. v. Bancroft, 116 Tex.Civ.App. 170, 40 S.W. 837, writ ref.

In his alternative count, appellee sought to prove that appellant held itself out as Petroleum's partner and is, therefore, estopped to deny it. In support of his contention that the evidence was sufficient to raise the issues relied on in this case to establish a partnership by estoppel appellee relies on Hoerster v. Wilke, Tex.Civ.App., 140 S.W.2d 952, affirmed 138 Tex. 263, 158 S.W.2d 288. There it was held that it is not necessary in order to create a partnership liability to prove an actual partnership agreement but that such liability may be created by estoppel to deny the existence of that relationship where the conduct of the party charged is such as to lead another to extend credit on the assumption of a partnership relation. We agree with the law as set forth in this case but the court did not discuss the evidence presented upon the trial other than to say that it was sufficient to raise the issue.

Under the subject "Partnership" in 32 Tex.Jur., Sec. 32, p. 270, the pertinent rule is stated as follows:

"§ 32. Estoppel as to Existence or Formation.—It is a general rule that persons who have permitted themselves to have the appearance of being partners, or who have represented that they were partners, are estopped to deny the fact of partnership as against one who has dealt in reliance on the truth of such representation or who

has extended credit to the supposed firm. Such an estoppel disregards the question as to whether in fact there was a partnership, presupposing indeed that none existed. Statements or acts are not a basis for estoppel unless they were known to and acquiesced in by the person estopped, and made to or known by and relied on by the person claiming estoppel.

"The holding out must be in such manner as to induce another reasonably to believe that a partnership exists and to extend credit upon that belief. Use of a trade name by persons holding themselves out as owners, each having an owner's interest and a right to profits of a business, will sustain a finding of partnership towards third persons contracting with them. But conjecture or surmise is not enough. And partnership by estoppel does not arise in favor of one who knows that one of the parties is a corporation."

█ We have therefore set forth at length the statements which appellee testified were made by both McCullough and English regarding the wells, being a J. Robert Neal job, and the directions given by them in regard to the billings. Appellee testified, too, that he would not have sold the butane gas to Petroleum on credit in the absence of such statements. However, it is without dispute in the record that both McCullough and English were employees of Petroleum for an appreciable period of time before as well as during the entire period from December of 1954 through April 6, 1955, when the account sued on accrued. The proof also showed that when McCullough supervised the moving of the rig from the Pipkin well after it was completed to the McFaddin location, he performed that service for Neal personally and that was after the last delivery of butane gas. It is equally clear that Neal took over the rig under a mortgage which he had held against it for part of its sale price, which mortgage had been given in February, 1953. Other than in this instance it was not shown that either McCullough or English was ever in the employ of Neal, Inc., or Neal personally. Their statements under these facts could not have been binding on appellant. Nor was it shown that appellant or its officers ever had any notice before the last well, the Pipkin, was completed that any such statements had been made. Certainly the conversation between appellee and Neal on April 9, 1955, could in nowise have caused appellee to extend credit to Petroleum because the account had fully accrued before that date. Appellee stresses the fact that Gatoura, an attorney who was also vice president of Neal, Inc., had a common reception room with Petroleum in the Electric Building. As heretofore pointed out, it was not shown that appellee ever saw Gatoura, knew who he was, or that he was connected with Neal, Inc. Nor was it shown that Gatoura ever saw or knew appellee or that he had any knowledge of appellee's sale of butane gas to appellee. Certainly appellee placed no reliance on this remote circumstance. In fact, he could not have done so. It was of no significance.

Moreover, appellee admitted that all of the invoices were made to Petroleum and were sent to its office in the Electric Building; that he went to Petroleum's offices to make his collections; that all payments that he received were made by Petroleum and that at no time had he ever talked to Neal or been to the offices of Neal, Inc., in the J. Robert Neal Building before the date of this last delivery of butane gas on April 7, 1955. These facts demonstrate that appellee did nothing to show that he was in anywise relying on Neal, Inc. for the account.

In fact, as appellee directly admitted in his testimony, the only thing he relied on was the statement made by McCullough that these were J. Robt. Neal jobs, that Neal was in good shape and that he would get his money.

We are, therefore, of the opinion that the evidence was wholly insufficient to support the findings of the jury on those issues. Kallison v. Southland Lumber Co., Tex.Civ.App., 136 S.W.2d 879; Kelly v. Heimer, Tex.Civ.App., 312 S.W.2d 430, writ ref., n. r. e.

The judgment of the trial court, therefore, is hereby reversed and the cause is here rendered in behalf of the appellant.

Reversed and rendered.