LONG ISLAND LIGHTING COMPANY,
Plaintiff and Counterdefendant,

v.

BOKUM RESOURCES CORPORATION,
Defendant and Counterplaintiff.

Bankruptcy No. 81–00666.

United States Bankruptcy Court,
D. New Mexico.

Dec. 16, 1983.

Montgomery & Andrews by Michael W. Brennan, Santa Fe, N.M., for plaintiff and counterdefendant.

Melton & Puccini, P.A. by Stephen P. Curtis, Albuquerque, N.M., for defendant and counterplaintiff.

## MEMORANDUM OPINION

JAY L. GUECK, Bankruptcy Judge, Sitting by Designation.

## BACKGROUND

THIS MATTER comes before the Court for trial on Counterclaims II, III and IV of Bokum Resources Corporation against the plaintiff, Long Island Lighting Company. "COUNT II" seeks a declaratory judgment that the Long Island Lighting Company (LILCO) and Bokum Resources Corporation (BRC) were engaged in a mining partnership to extract uranium ore from the Marquez mining properties owned by BRC near Marquez, New Mexico. BRC contends the mining partnership resulted from a Uranium Concentrates Purchase Contract entered into by and between the parties on January 30, 1976. This contract is known as the "1976 UCPC". Further agreements were entered into between LILCO and BRC in 1978. BRC claims these agreements continued and expanded the original partnership to include two more mines and the construction of a mill.

It is then alleged that as a result of this mining partnership, LILCO owed fiduciary responsibilities to the shareholders of BRC and that it violated those fiduciary responsibilities by virtue of its conduct toward BRC. BRC also argues that LILCO wrongfully prevented BRC from making current contracts for future deliveries of uranium to third parties from the Marquez Property until LILCO had received all of its deliveries from BRC. This conduct, according to BRC, prevented it from obtaining financing elsewhere, with the result that BRC was compelled in 1978 to enter into a series of agreements with LILCO containing terms so onerous that BRC was placed in a position of imminent default. BRC claims these agreements granted LILCO sufficient control over BRC that LILCO had a further fiduciary responsibility to disclose to BRC shareholders, the SEC and others that BRC was under the control of LILCO. LILCO denied this control. It is also noted that BRC denied such control at the time it obtained stockholder approval of its 1978 agreements with LILCO. Nevertheless, BRC contends the conduct of LILCO constituted acts of economic coercion against BRC, all to its damage.

The declaratory judgment sought by BRC asks the Court to find that by virtue of the mining partnership and the conduct of LILCO in violating the asserted fiduciary responsibility, in wrongfully preventing BRC from selling uranium forward, and in interfering with BRC's ability to obtain alternative financing, LILCO should be obligated to pay all third party creditors of BRC relating to the Marquez Property and mill. Additionally, BRC seeks to have the Court declare that LILCO should be obligated to pay damages to BRC in order that BRC might be restored to the condition it would have enjoyed except for the wrongful acts of LILCO, and that LILCO should recover nothing on any alleged indebtedness from BRC to LILCO as a result of funds advanced by BRC by LILCO.

"COUNT III" alleges that as a result of the aforementioned conduct of LILCO, BRC has been damaged in the amount of at least $55,000,000.00 in addition to any indebtedness due from BRC to LILCO and

that the wrongful acts of LILCO were maliciously and willfully committed, giving rise to punitive damages.

"COUNT IV" alleges that the conduct of LILCO constituted fraud, for which BRC should be awarded compensatory damages in an amount of not less than $55,000.000. in addition to the forgiveness of any indebtedness of BRC to LILCO, together with punitive damages in the amount of $5,000,000.

## FINDINGS OF FACT

The salient facts are as follows:

BRC is a uranium mining company doing business in the State of New Mexico. LILCO is a supplier of electrical power, with home offices in New York. In order to supply such power, it became necessary in the 1970's to construct nuclear power plants for the generation of electricity. These nuclear power plants require, as a source of fuel, large quantities of uranium concentrates. These uranium concentrates are commonly referred to as "yellowcake."

Prior to 1975, LILCO had relied upon Westinghouse as its source, or primary source, of yellowcake. However, on September 8, 1975, Westinghouse notified LILCO that it would no longer honor its supply contracts. The reason given was that a very steep rise in the market price of uranium at that time made it commercially impractical to continue under existing contracts. The price of yellowcake when Westinghouse declared its default was approximately $17.00 a pound. By January, 1976, it had reached $35.00. The price peaked at $43.40 per pound in 1978, and went steadily downward thereafter. By August, 1981, it had dropped to $23.50. These prices were based upon "spot delivery", i.e. delivery at that time. The prices for delivery in the future were much higher, due to inflationary factors in the expected costs of mining.

In September, 1975, LILCO had three power plants in the process of construction which it expected to have fully operational during the period 1979–1983. Its anticipated need for uranium was approximately 20,000,000 pounds through 1995 and 40,000,000 pounds over the life of the plants. Thus, it was necessary to locate an alternative source of uranium upon the default of Westinghouse. This lead to negotiations with BRC.

BRC was formed by Richard Bokum a few years prior to 1975 for the purpose of exploring for and developing uranium deposits. By 1975, BRC had acquired a property known as the "Marquez Property", in which there had been determined to exist at least 4.2 million pounds of uranium as of December, 1975. There was still much of the property left for exploration. BRC determined by the fall of 1975 to sell or make other arrangements to fully develop the property. Several contacts were made for this purpose, with LILCO being one of those contacts.

The first serious negotiations for the supply of uranium concentrates (yellowcake) by BRC to LILCO occurred in Santa Fe, New Mexico between Christmas 1975 and New Years 1976. This culminated in the contract, known as a Uranium Concentrates Purchase Contract of January 30, 1976 between BRC and LILCO. This is reflected in Exhibit 17, and is known as the "1976 UCPC".

This contract was the product of extensive negotiation, much of which was the subject of testimony by both sides. Objections were interposed, based on parol evidence. Some testimony was allowed for the purpose of bearing on the state of mind of LILCO on the fraud claim and the claim of economic coercion, and to bear on the issue of punitive damages. However, insofar as testimony relating to negotiations may tend to vary or explain the terms of the contract, I have chosen to disregard it. The reason for this is that Exhibit 17, the 1976 UCPC, is clear, unambiguous and expresses therein that it is fully integrated. (Article 19). I will later discuss herein what I perceive to be the legal consequences of the agreement, but what constitutes, as a matter of fact, the agreement of

the parties is fully embodied within the terms of that instrument.

This contract resulted from the fact that BRC had significant quantities of uranium reserves to be developed on its leasehold near Marquez, New Mexico, but it had insufficient capital to mine, let alone mill, its uranium ore. LILCO was in need of immediate arrangements to satisfy long-term requirements for the production of large quantities of uranium concentrates. The production of the quantity of uranium sought by LILCO would necessitate a large capital expenditure and a substantial increase in the staff of BRC. Mr. Richard D. Bokum, the Chief Executive Officer of BRC, preferred to sell the company rather than develop the property, and so indicated to LILCO. Additionally, he was concerned about doing business with a corporate bureaucracy who was unable to make on-the-spot decisions or who might tie his hands in his operation. This, too, was communicated to Lilco personnel. Mr. Bokum was assured by those LILCO representatives present that if an agreement were reached he would only need to negotiate with those present and that "matters will run smoothly."

LILCO did not possess sufficient expertise to mine for uranium and preferred to rely on BRC in this regard. LILCO's primary objective was to make arrangements to be assured of a long term supply of uranium concentrates for its three proposed nuclear plants.

Pursuant to the contract ultimately reached by the parties on January 30, 1976, LILCO agreed to purchase from BRC 5,000,000 pounds of yellowcake at specified prices, ranging from $25.55 to $40.40 per pound. A purchase price security deposit was provided to BRC by LILCO in the amount of $15,000,000.00. This $15,000,000 advance was not totally for the use of BRC as it saw fit. Rather, $6,000,000 of this amount could be used by BRC for its own purposes, including the payment of any creditors it deemed appropriate. The sum of 7.5 million dollars was placed in an "Escrow Account" with the Albuquerque National Bank for use in the construction and development of the mine to secure performance of delivery obligations under the contract. Disbursements were only to be made upon the approval of both BRC and LILCO. The remaining 1.5 million dollars was to be held in an "Investment Account" for use in exploration and development of other uranium mining properties of BRC. Expenditures from this account were also on the approval of BRC and LILCO, jointly. LILCO had an option to purchase uranium from these properties.

The $15,000,000 was to be repaid to LILCO by crediting at least $3.00 per pound against the price of uranium delivered until the $15,000,000 was repaid. However, nothing in the contract excuses BRC from repayment if uranium was not produced. Thus, repayment of the $15,000,000 advance was not contingent on production. To the extent that production was not sufficient to accomplish repayment of the $15,000,000, BRC would have to accomplish repayment from other sources.

This $15,000,000 provided a source of funds to finance the development and production of uranium under the contract and to pay other bills of BRC, as well. As security for BRC's performance to LILCO, BRC assigned its leasehold interest to LILCO. Other provisions of the contract included a requirement that BRC actually dedicate its leasehold interest in the Marquez Property to the fulfillment of its contractual obligations to LILCO, and a provision that BRC have the mine in production by June, 1978.

In addition to the 5 million pounds and the option to purchase additional uranium at market prices from other properties, LILCO was granted an option on another 1 million pounds at a fixed price, as well as a right to purchase any ore in the ground where it was uneconomical for BRC to mine such ore at a profit. LILCO could then use or sell such uranium on its own, as it wished.

The contract also provided that no uranium could be sold to any third party without LILCO's consent until BRC had produc-

ed and had available for delivery enough uranium to meet its requirements to LIL-CO. That particular provision, set forth in Article 12 of the 1976 UCPC, stated: "... no sales from the Property of uranium ore or of $U_3O_8$ contained in Concentrates shall be made to any third party without Buyer's consent unless and until Seller has produced and has available for delivery sufficient quantities of $U_3O_8$ contained in Concentrates in bonded storage facilities consigned to Buyer to fulfill its obligations to Buyer, including any obligation provided in Article 13 hereof."

This provision became the source of much controversy leading to this litigation.

Finally, there were requirements that BRC submit reports, geological and progress data, financial information and other data upon request to LILCO. A series of breaches was defined which could lead to take-over rights of LILCO for the purpose of fulfilling the contract. LILCO's remedies also included foreclosure rights.

A *force majeure* clause provided either party would be excused from performance due to various causes beyond its control for the period of the *force majeure*.

The contract was to be governed by the laws of New Mexico, and took effect on January 30, 1976.

At the time of the 1976 UCPC, BRC had neither a mine nor a mill. The funds from the 1976 UCPC were to get the mine into production. BRC hoped to accomplish milling through a toll-milling arrangement with another company. Thus, no mill was contemplated in the 1976 agreement.

Within a few months, BRC commenced work on the mine. Shaft sinking was begun in August, 1976. It had been determined that a depth of 2100 feet would be required to reach the uranium ore on the Marquez Property. However, on May 27, 1978, a flood occurred in the mine shaft at a depth of 1739 feet. BRC attempted to deal with this flow and drill further, but another flood occurred on January 1, 1980, after achieving a depth of about 1839 feet. No further progress has occurred, and

BRC abandoned work on the mine in August, 1980.

In the meantime, just before the problems of flooding, BRC found it had difficulty obtaining a toll-milling agreement. Further, additional uranium reserves were determined to be available which could afford BRC the opportunity to mill ore from the Marquez Property for LILCO, develop more reserves, sell uranium to third parties and provide toll-milling services to others, as well. Thus, BRC explored various methods of developing these reserves and constructing a mill. Outright sale of the company was explored with numerous entities, including LILCO, up through at least 1979, and into 1980. None of these came to fruition. Additionally, the sale of part of the BRC stock was considered, but Mr. Bokum, the President, did not want to dilute the stock of his shareholders. He personally owns 35% of that stock. Bank financing was explored, but failed.

Mr. Bokum testified he could have sold contracts to deliver uranium in the future to raise money, but that LILCO had contended he couldn't "sell forward" until the contract to LILCO was fulfilled. Thus, he apparently made little effort in this regard, although he did not agree with LILCO's alleged contention.

Mr. Hugh P. Boylan, a former Vice President of Purchasing and Inventory Control with LILCO, testified that, while there were arguments over BRC's right to sell forward, LILCO's position was that BRC couldn't *deliver* to others before completing its contractual commitment to LILCO. However, he indicated LILCO never contended that BRC could not enter into a contract or sales agreement with third parties for future deliveries. Additionally, the evidence reflected that in 1977, in connection with a proposal submitted by BRC, Mr. Boylan sent a memorandum to his senior management indicating that "rejection of the offer under terms of the contract would permit BRC to sell this quantity to another buyer." This memorandum was prepared during the same period of time Mr. Bokum alleged that LILCO was wrong-

fully contending he could not sell uranium for future delivery to another buyer.

In 1977 when BRC discovered additional ore reserves and determined to build its own mill, the negotiations with LILCO for funding the mill began. At this time LILCO considered purchasing BRC, but the parties were several millions of dollars apart on value. Richard Bokum continued his efforts to sell the company to several other parties and to explore other means to raise funds to mill uranium. Negotiations with LILCO included the purchase of additional uranium as an alternative to purchasing the company. A joint venture in milling was also the subject of negotiation. However, no such agreement was executed.

During 1977, without first obtaining a commitment of funds, BRC obtained bids for constructing a mill. On September 9, 1977, a contract was signed with Stearns-Roger, Inc. to build a mill. Stearns-Roger estimated the cost at $26,000,000 at that time. Delays and costs over-runs were apparently experienced, and, in January, 1979, after incurring approximately $40,000,000 in building costs, Stearns-Roger was fired and Greyback Consolidated, Inc. took over construction.

Although LILCO had not yet committed to funding a mill, Mr. Bokum invited representatives of LILCO to the meetings with Stearns-Roger. Mr. Bokum's testimony was that while he didn't think he was legally obligated to do so, he felt morally obligated, and felt LILCO was his "partner". Yet, he also acknowledged that one of the reasons he invited Lilco to these meetings was that he hoped to "interest them in becoming" BRC's partner in building the mill.

When negotiations commenced in 1977, the future for BRC still appeared promising, and the price of uranium was escalating. Thereafter, in the midst of the flooding of the mine in 1978 and 1980 and the debacle in mill construction during the same period of time, the incident at Three-Mile Island occurred on March 28, 1979. Thereafter, the price of uranium plummeted downward. Further, as negotiations progressed during 1977–1978 the financial straits of BRC became evident, and by 1978 default on the 1976 UCPC appeared imminent.

In 1978, negotiations between LILCO and BRC became more and more acrimonious. The controversy then arose over the right of BRC to sell uranium forward (i.e. for future delivery) prior to fulfilling its rights to LILCO. The extent of LILCO's control over BRC in proposed agreements was the subject of concern, and disputes arose over LILCO's refusal to include a force majeure clause in the Mine and Mill Development Financing Agreement. Richard Bokum accused LILCO in 1978 of negotiating in bad faith and of imposing such onerous terms upon BRC that it would be in default even upon entering into any new agreement. This, he said, was economic coercion. He continued to explore other alternatives for funding or selling BRC, but to no avail. At the same time, LILCO continued to advance more funds. Extensions of time within which to perform under the 1976 UCPC were granted to BRC, and a series of additional contracts were executed by the parties on April 7, 1978, with a final closing on further agreements in December, 1978. These final agreements were dated July 21, 1978.

The basic 1978 agreements were an additional Uranium Concentrates Purchase Contract (1978 UCPC), a Uranium Contract Mine and Mill Development Financing Agreement (Financing Agreement), and a Contract for the Sale of Concentrates (CSC).

The Mine and Mill Development Financing Agreement provided for LILCO to loan $45,000,000, plus pre-paid interest, for a total of 51.1 million dollars to be used to complete construction of the Mill and two more mines. BRC contends the transaction, while denominated as a "loan", was really more in the nature of a capital contribution to a greater joint venture. Thus, it placed LILCO in an equity position rather than that of a lender. This Financing Agreement (Exhibit 161) is clear in its

terms that it was a loan to finance construction and development of BRC's mine and mill, and I find as a matter of fact this is what was negotiated and agreed upon by the parties.

The loan under the Financing Agreement is evidenced by a promissory note for $51,100,000, including interest at ten and one-half percent. A loan commitment fee of one-half percent was also provided as consideration for the Financing Agreement. It is noted that LILCO was also to receive warrants to purchase BRC stock at a fixed price of $35.00. The evidence reflected this was to afford LILCO the opportunity to share in fruits of BRC's profit, if successful, and formed additional consideration for providing the financing.

Repayment of sums advanced under the Financing Agreement was not conditional on profits or any other factors. Security for repayment was provided by an assignment of leases, mortgage and security agreement. This provided for the pledge of future assets and income. Additional security was granted in the form of provisions to convert the note, under conditions of default, to preferred stock. This could be used by LILCO to assume control of BRC in the event of default. Events of default were specifically described.

Certain obligations were imposed upon BRC under the Financing Agreement. These included the obligation of BRC to submit a Project Plan setting forth projected dates for completion of various steps, as well as projections with respect to costs and estimated profits. LILCO was to be given periodic reports, be provided with access to books and records of BRC and be consulted regarding BRC's periodic budgets. Various other restrictions and limitations were imposed on BRC's conduct of its business affairs during the term of the Agreement, and the proceeds advanced under the note were to be used by BRC only to pay mine and mill expenses, subject to the approval of LILCO.

The Financing Agreement required shareholder approval by BRC and stated, in § 7.1, that a Proxy or Information State-ment would be issued, which would comply in all material respects with the Securities and Exchange Act of 1934 and "(ii) will not contain any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." (Exhibit 161—Mine and Mill Development Financing Agreement, § 7.1, pp. 39–40).

The Proxy Statement which issued made no mention of a joint venture or a partnership nor did it reflect any statement that the 1978 Agreements would result in any control of BRC by LILCO. In fact, BRC specifically noted it was *not* under the control of LILCO, stating in the Statement:

"In the Financing Agreement, LILCO has sought and obtained highly restrictive covenants with respect to the business activity of the Company.... Although LILCO had an extremely strong negotiating position, the Company and LILCO believe (while recognizing that contrary arguments might be made) that LILCO does not 'control' it for purposes of the federal securities laws."

Additionally, BRC's counsel wrote to the SEC in October, 1978 that:

"The Company is of the view that it is neither controlled by nor under common control with LILCO and that the Company could only be controlled by LILCO in the event of a default under the terms of the Financing Agreement, after which LILCO would exercise its option to convert the Note to Senior Preferred Stock."

Later, BRC's counsel wrote to the SEC as follows:

"There is no question ... that LILCO, in order to secure its financial interests, has extracted what may be considered highly restrictive covenants from the Company. However, absent a default in the Company's obligations on the ten and one-half percent Convertible Secured Note due April 30, 1986, and the conversion of the Note into preferred stock, LILCO does not possess the power to direct or cause

the direction of the management and policies of the Company."

In the same communication stated above, counsel went on to state: "Neither the Company nor LILCO believes that any fiduciary obligation on behalf of LILCO to the Company arises with regard to a series of agreements, albeit tightly drafted, that were negotiated over a two-year period wholly at arms length."

This same advice was communicated to the SEC by LILCO's counsel on November 6, 1978, when the view was expressed that the 1978 agreements "do not result in control by LILCO of BRC or give rise to any fiduciary obligation by LILCO to BRC."

The "1978 UCPC" (Uranium Concentrates Purchase Contract) actually took effect when the loan closed after shareholder approval, in December, 1978. This Agreement incorporated parts of the "CSC" (Contract for the Sale of Concentrates) entered into on July 31, 1978, and superseded that document. The CSC had been a vehicle to provide further financing to BRC on an interim basis while shareholder approval was obtained for the Financing Agreement. LILCO advanced an additional $13,000,000 by way of an advance deposit on 4 million more pounds of uranium under that CSC. The security deposit then became part of the new loan under the 1978 UCPC.

At the risk of further confusing and complicating matters, the evidence reflects that on April 7, 1978, a Uranium Concentrates Purchase *Agreement* (1978 UCPA) was executed by and between the parties to provide for the purchase by LILCO of an additional 1 million pounds of yellowcake to be delivered in 1986 and 1987. This was in addition to the exercise of its option under the 1976 UCPC for 1 million pounds of uranium to be developed in 1985. This option was also exercised on April 7, 1978.

By this time, controversy was already emerging over claims of bad faith and economic coercion. Thus, LILCO required BRC to waive any claims it might have alleged under the 1976 UCPC as a condition to providing further financing or engaging in further purchases of uranium from BRC. Significantly, LILCO and BRC agreed, as a part of these April 7, 1978 Agreements, that before May 1, 1978 BRC would not sell uranium forward to any other party. LILCO was then afforded a right to match any other bona fide offers BRC might receive from others after May 1, 1978.

The CSC of July 31, 1978, superseded the April 7, 1978 UCPA. The 1978 UCPC, when it closed in December, 1978, then terminated the CSC. Nothing in the evidence indicates this 1978 UCPC has yet been terminated. It appears to still be operable.

The evidence leading up to these agreements indicates LILCO considered the acquisition of BRC, but never at a price acceptable to Bokum. LILCO then bargained hard in negotiating the purchase of additional uranium and providing any additional financing. Internal documents of LILCO reflect its knowledge of the BRC financial crisis developing in 1978. These notes and documents also reflect the opinion of some executives and advisors of LILCO that it was in a strong bargaining position, having tied up "pretty tightly" BRC's production of uranium, that BRC would very likely be defaulted, and that perhaps LILCO's position should be to "be rigid" and "push RDB" ... (i.e. Richard D. Bokum) ... "up against the wall." These were in the context of the discussion of various options. The options considered varied from pushing BRC into default, to engaging in a joint venture with BRC for their mutual advantage.

The evidence reflects hard bargaining by both sides. Although LILCO endeavored to extract tight agreements, it also granted extensions to BRC to prevent defaults, additional sums were advanced even when financial problems were perceived, and defaults were not pursued when they occurred. As of the time of trial, the obligations of BRC to LILCO by virtue of these advances including interest, amounted to $93,954,281.00.

A great many factors combined to place BRC in its financial cataclysm. These included the vicissitudes of the market, which was impacted by the occurrence at Three-Mile Island, flooding of the mine, cost overruns, delays in construction, inadequate planning for mine and mill development, inability to consummate a deal elsewhere for the acquisition of BRC and an unwillingness to resort to alternative financing, which Mr. Bokum deemed to be ill-advised.

BRC contends that, in addition to these problems, what really caused its demise was the lack of *force majeure* in the Financing Agreement (it was retained in the 1978 UCPC) and the bargaining methods of LILCO, particularly the contention that BRC could not sell uranium forward to other customers.

## CONCLUSIONS OF LAW

I. *Is there a "mining partnership" between BRC and LILCO?*

█ The parties do not appear to disagree that New Mexico law should apply in resolving this issue. Both the 1978 UCPC and the 1976 UCPC provide that the contracts shall be governed by the law of the State of New Mexico. However, the Mine and Mill Financing Agreement provides that it should be governed under New York law. The issues here do not involve contract construction; rather, the substantive question of what legal relationship has been established by virtue of these agreements and the conduct of the parties is the question. It is not clear whether the agreements were all entered into in New Mexico, or whether some were executed in New York. Performance was largely to be accomplished in New Mexico. The final acts to effectuate most of these agreements appear to have occurred in New Mexico. Thus, under the choice of law

applicable to contracts as followed in New Mexico, it would appear that New Mexico law should govern. *Ratzlaff v. Seven Bar Flying Service, Inc.,* 98 N.M. 159, 646 P.2d 586 (1982). In attempting to resolve the legal relationship that has occurred between these parties, an effort has been made to ascertain and apply principles of law consonant with those of the State of New Mexico.

BRC contends that the documents entered into in 1976 and 1978 established a "mining partnership" between BRC and LILCO. This alleged partnership originally concerned a single mine in 1976, and was expanded in 1978 to include the mill and two more mines. LILCO maintains the arrangement from its inception was one of a buyer-seller, borrower-lender.

In applying the facts herein to the applicable law, it is necessary to review the development of the law of mining partnerships.

Although general partnerships have been recognized since early civilization, the concept of "mining partners" did not evolve until the 19th Century, when it came to be recognized in England and, later, in the Western United States. Since that time the relationship has been the subject of extensive commentary by authorities on the subject.[1] There has not been an abundance of authoritative decisions on mining partnerships.

Inasmuch as some controversy exists in this case over one of the elements of a mining partnership, as well as controversy over the imposition of mining partnership principles against these litigants, who are direct parties to the alleged partnership, a more exhaustive review of the authorities than might otherwise be required appears to be in order.

A review of the works and decisions contained herein indicates that the develop-

---

1. Commentaries containing discussions and citations to other discussions on mining partnerships may be found in Brimmer, *Mining Partnerships,* 15 R.Mt.Min.L.Inst. 85 (1969); Fiske, *Mining Partnership,* 26 Ann.Inst. on Oil & Gas Law and Tax 187 (1975); 3 Lindley on Mines, §§ 796–803 (3rd Ed.1914); Summers, *Oil and Gas,* Ch. 24 (1962); 4 *American Law of Mining,* Ch. II "Mining Partnerships", § 22.27 to § 22.47 (1969). While this is by no means an exhaustive list, such a catalog of authorities is cited in these articles.

ment of mining operations in England and the United States presented peculiar problems in the nature of the operation as well as the relations between parties who associated to pursue the working of claims. It became evident that a distinct legal relationship was necessary to address these peculiar needs. There were often a number of people who would associate in owning and developing a claim. Frequently, individuals would wish to sell or assign their interest to a stranger. Indeed, in the early days ownership interests might change for one reason or another overnight. More often than not, certain members of the association might be in it merely to supply the capital or equipment, without any expertise in the physical working of a mine. This still is the case.

In the midst of all this, it was essential to the successful operation of a mine that it be kept in continuous operation, not subject to having its associates' affairs wound up as a result of an automatic dissolution every time one member of the association parted with his interest. The transfer or assignment of shares through sale, loss for one reason or another, death or bankruptcy, could not be allowed to thwart the entire mining operation. It was evident that those who formed associations for the purpose of mining a claim frequently had no desire or need to rely on the *delectus personae*, or "choice of person", inherent in a general partnership activity. However, this also led to the recognition that those who drew together to pursue a mining claim had no interest or desire to be saddled with the broad scope of liability for acts of "co-partners"; yet, it was generally impractical to provide for each to work his interest separately.

Thus, the Courts and, more recently, legislatures have endeavored to fashion legal principles capable of application in various fact contexts to protect the rights of individual proprietors while, at the same time, securing the claims of creditors and other

third parties and insure the successful working of the mine.[2]

It is as a result of these peculiarities that the principles of a "mining partnership" have evolved. A mining partnership possesses some of the same attributes as a general trading partnership, but is distinctly different in certain respects. *Skillman v. Lachman*, 23 Cal. 198 (1863). It is also separate and distinct from, and perhaps the precursor of, the "grubstake contract", as will be later discussed herein. *Meister v. Farrow*, 109 Mont. 1, 92 P.2d 753 (1939); Brimmer, *Mining Partnerships, supra.* The mining partnership has been said by some to be a form of joint venture. Groves, "Co-Ownership of Mining Properties", 2 R.Mt.Min.L.Inst., 277 (1956). However, even here, there appears to be distinctions. In short, the relationship of "mining partners" is *sui generis*.

This circuit has recognized three essential elements to a common law mining partnership. "[T]here must be a joint interest in the property by the parties sought to be held as partners; there must be an agreement to share in profits and losses and there must be conduct showing cooperation in the project. All these elements must be present. The absence of any one will be fatal to such a relationship." *Gilroy v. White Eagle Oil Co.*, 201 F.2d 113 (10th Cir.1952), p. 116. This has consistently been applied as the essential criteria to the existence of a mining partnership. See 4 *American Law of Mining*, Ch. II "Mining Partnerships", § 22.30 (1969). *Gilroy* applied Oklahoma law to a dispute arising out of an Oklahoma oil and gas lease. BRC contends the other western "solid-mineral" states do not require a sharing of profits or losses, citing Summers, *Oil and Gas*, §§ 721.1 and 724 (2d Ed.1980), and *Bently v. Brossard*, 33 Utah 396, 94 P. 736 (1908). Counsel for BRC suggest that Oklahoma, along with Kansas and Texas, are "oil" states, and that they are alone in the re-

2. Without citing specific authority for this general background, it is the common thread which runs through all of the commentaries. Such discussions are also contained in the early case authority developing the law of mining partnerships, beginning with the seminal case of *Skillman v. Lachman*, 23 Cal. 198 (1863).

quirement that profits be shared. An examination of cases cited by counsel reveals this not to be the case.

*Bently v. Brossard, supra,* clearly held that a sharing of profits is essential. "To be a partner one must of course have an interest in carrying on the business or adventure, and must have a common ownership of, or a community of interest in, the profits of the business. While a community of interest in the profits is not alone conclusive of the existence of a partnership, it nevertheless is of the very essence of the contract of partnership, for without it a partnership cannot exist in contemplation of law." *Bently v. Brossard, supra,* at p. 742.

The Court went on to note that an express agreement to share profits and losses is not necessary, but the purpose must certainly be implied. The definition of a mining partnership was stated thusly:

"A mining partnership arises when two or more co-owners of a mining claim actually engage in working the same, and share, according to the interests of each, in the profit and loss, although there is no express agreement between them to become partners, or to share the profits and losses." *Bently v. Brossard, supra,* at p. 743.

Subsequently, in *Mud Control Laboratories v. Covey,* 2 Utah 2d 85, 269 P.2d 854 (1954), the defendant pointed to the lack of an express agreement to share losses as a preclusion to the existence of a mining partnership. The court cited *Bently* for the proposition that "an agreement to share losses is not a condition precedent to the existence of a mining partnership." *Mud Control Laboratories v. Covey, supra,* at p. 859. There was no determination that a sharing of *profits* was unnecessary, and, while there need be no agreement to share losses, it was recognized that such responsibility is incident to the relationship. The decision further reflected that the law of Oklahoma to the contrary (i.e., sharing of *losses* as a required element) was not in harmony with a majority of states. No citations were provided in the decision to support this statement.

The Supreme Court of Colorado, in 1883, determined a mining partnership existed where parties associated for the purpose of carrying on a mining operation, acquired an interest in the property as tenants in common, and jointly worked the mine "for their joint benefit and profit, establishing such a community of interest in the adventure as constitutes a mining partnership." *Manville v. Parks,* 7 Colo. 128, 2 P. 212, 215 (1883).

This was amplified in the decision of *Meagher v. Reed,* 14 Colo. 335, 24 P. 681 (1890), where a sharing of profits was considered in finding the existence of a mining partnership. An exhaustive review of the then-existing law on mining partnerships was undertaken, citing the leading cases of *Skillman v. Lachman,* 23 Cal. 198 (1863); *Kahn v. Central Smelting Company,* 102 U.S. 641, 26 L.Ed. 266 (1881), and other decisions, including the courts of England. One of the early English cases cited was *Fereday v. Wightwick,* 1 Russ. & Mylne, 49. There, it was noted that six persons had jointly taken out a lease for mining purposes. "The mines and surface were used with a communion of expense and a communion of profit." The court found a partnership to exist and the property in dispute to be partnership property.

*Lyman v. Schwartz,* 13 Colo.App. 318, 57 P. 735 (1899), cited by BRC, also found a mining partnership where the defendants were jointly engaged in working a mine, some contributing money while others contributed services, and each to share equally in the "result." *Lyman v. Schwartz, supra,* at p. 736.

The first decision in the United States to clearly recognize mining partnerships was *Skillman v. Lachman,* 23 Cal. 198 (1863). The principal point raised was that owners of a mining claim were tenants in common and not partners. The court reviewed some of the differences between a mining partnership and an ordinary partnership, and discussed the necessity of special partnership rules to apply to the uncertainty of

mining operations. There was no discussion of an agreement to share profits and losses. Rather, the court directed its attention to the relationships of tenants in common and partnerships. The court stated: "Whatever may be the rights and liabilities of tenants in common of a mine not being worked, it is clear that where several owners unite and cooperate in working the mine, then a new relation exists between them, and, to a certain extent, they are governed by the rules relating to partnerships. They form what is termed a mining partnership, which is governed by many of the rules relating to ordinary partnerships, but which also has some rules peculiar to itself—one of which is that one person may convey his interest in the mine and business, without dissolving the partnership." *Skillman v. Lachman, supra,* at p. 203.

California subsequently adopted a Code defining a mining partnership to exist when two or more persons who own or acquire a mining claim for the purpose of working it and extracting mineral therefrom actually engage in working the mine. The Code further specifically provides that an *express agreement* to become partners or to share in the profits and losses of mining is not necessary to the existence of the partnership. That Code then provides in § 2352 that members of a mining partnership share in profits and losses in proportion to their ownership interest, in the absence of an agreement making other provisions for the sharing of profits and losses. Thus, even this Code provision is consistent with the multitude of other decisions that imply, from the relationship of a mining partnership, an agreement to share in profits and losses.

The California Supreme Court had occasion, in *Treat v. Murdock,* 8 Cal.2d 316, 65 P.2d 881 (1937), to determine if a debtor-creditor relationship or a mining partnership existed where funds were advanced by the plaintiff whose note was to be paid out of a percentage of net proceeds of the mining operation, and the defendant was to continue paying a share of such proceeds after the note was satisfied. This decision recognized the element of profit-sharing as

a part of the mining partnership, but found a debtor-creditor relation to exist, since the plaintiff had acquired no real "interest" in the mining property and never participated in the mining operations. Accord *Harper v. Sloan,* 177 Cal. 174, 169 P. 1043 (1917).

The earliest decision in New Mexico on mining partnerships is *Daily v. Fitzgerald,* 17 N.M. 137, 125 P. 625 (1912). The question of whether an agreement to share in profits and/or losses is necessary to constitute a mining partnership was neither raised nor discussed. The dispute arose over the authority of one defendant partner to bind a co-partner to agreements made by the first partner with the plaintiff. The defendants were admittedly engaged in a partnership. The question was whether it was an ordinary partnership or a mining partnership. The defendant whom the plaintiff was seeking to charge noted that a special feature of a mining partnership is the absence of *delectus personae,* the presence of which is integral to an ordinary partnership. This defendant then contended that a mining partnership existed and that due to the absence of *delectus personae,* there was a want of authority of one partner to pledge the personal credit of another partner except for certain designated purposes relating to the affairs of the partnership. Finally, it was contended that every agreement for the working of a mine is a mining partnership except where there is an express agreement to constitute a full trading partnership.

The New Mexico court found, under the circumstances of the case, that no mining partnership existed. The basis for this holding was that the written partnership agreement between the defendants indicated it was not an agreement for working a mine, but was a preliminary arrangement to acquire property for the purpose of later mining operations. Further, the contract between the defendants indicated their reliance upon the *delectus personae* in their relations. The court then affirmed the liability of all partners on the basis of implied authority, relying upon rules relating to an ordinary partnership in trade.

It is significant to note that the New Mexico Supreme Court placed great stress on the intent of the parties to the relationship, even in the context of third-party litigation. Indeed, it was this reliance upon which the court then imposed liability based upon general partnership concepts. The court stated, at page 156, 125 P. 625:

"Certainly it must be the intention of the parties, operating a mine, which must control. If they intend that their relations to each other shall be that of partners, with the confidential relations of an ordinary partnership existing, and the firm not subject to the intrusion of other members at will, no reason exists for the application of such business relations of the rules of an ordinary mining partnership."

In finding no mining partnership to exist under the circumstances of that case, the New Mexico Supreme Court discussed the distinctions and their ramifications between an ordinary partnership and a mining partnership referring to the early decision of *Skillman v. Lachman, supra*, in this regard.

It was held in *Gilbert v. Fontaine*, 22 F.2d 657 (8th Cir.1927) [now 10th Cir.] that Kansas recognized mining partnerships with respect to oil and gas leases. BRC contends that Kansas is one of only three states requiring an agreement to share profits and losses as an element of a mining partnership. However, the court in *Gilbert* referred not only to Oklahoma and Texas decisions but also to *Manville v. Parks, supra*, (Colo.), *Bently v. Brossard, supra*, (Utah) and the West Virginia decision of *Childers v. Neely*, 47 W.Va. 70, 34 S.E. 828, 49 A.L.A. 468, 81 Am.St.Rep. 777 (1899), in arriving at its decision. The court then observed that several of the states had promulgated statutory provisions relating to the existence of mining partnerships, but determined that such provisions are, in general, merely declaratory of the principles already established by the decisions of the courts. The sharing of profits and losses, as well as expenses, was considered as an element of the mining partnership there found to exist.

Texas, in *Southern Underwriters v. Gariepy*, 105 S.W.2d 760 (Tex.Civ.App. 1937), citing *Dunigan Tool & Supply Co. v. Carroll*, 60 S.W.2d 296 (Tex.Civ.App. 1933) [cited by BRC], held that in order to have a mining partnership there must be a "joint ownership of mining property, joint operation, sharing of profits, community of interests and mutual agency...", p. 764.

The United States Supreme Court first addressed the issue of what constitutes a mining partnership in *Kahn v. Central Smelting Co.*, 102 U.S. 641, 26 L.Ed. 266 (1880). The case arose in Utah, where the plaintiff sought an accounting from the defendant for the proceeds of a mining claim in that state. Justice Field recited the salient facts relating to the existence of a mining partnership. He observed that the plaintiff and two other persons were the owners and tenants in common of a mining claim, each with an undivided one-third interest. Further, they agreed to and did work the claim for its ores and metals, "bearing expenses and sharing the profits equally, ...". The court then adopted the language of *Skillman v. Lachman, supra*, in applying the mining partnership principles and discussing its ramifications. That decision appears to be the last word spoken on the matter by the United States Supreme Court.

The decision of the Montana Supreme Court in *Meister v. Farrow*, 109 Mont. 1, 92 P.2d 753 (1939), is also instructive. There, the defendant Farrow took an assignment of the lease and bond on an existing mining claim. Farrow was required to raise considerable sums of money to finance mining operations under the assignment. He then sold an interest in his claim to the co-defendants. Plaintiffs, third-parties not associated with the purported partnership, provided services and furnished materials in the development of the mine. The plaintiffs theory was that a mining partnership existed and that all defendants were liable. Defendants contended they only had an agreement to form a corporation for work-

ing the mine in the future, that they owned no interest in the mine *"in praesenti"*, and that they exercised no control over mining operations, since they possessed no knowledge or expertise in the practical operation of a mine.

The Montana Supreme Court likened the facts to those in *Bently v. Brossard, supra, Harper v. Sloan, supra*, and *Lyman v. Schwartz, supra*. In holding that a mining partnership existed, the court referred to the Montana Code defining mining partnerships, which it copied from California and which, in turn, represented what it called the American Common Law on Mining Partnership. That Code requires joint ownership of a mining claim, joint purpose of working the claim and actual working of the claim. Additionally, although an *express* agreement to become partners or to share profits and losses is not necessary, it is specifically provided in the Code that a member of such a partnership shares in profits and losses in proportion to the interest held by that member in the operation. The Court, in citing the Colorado decision of *Lyman v. Schwartz, supra*, noted that although Colorado had no statute defining the relation, its rule as set forth in the decisions was the same as in other "mining states" and as provided in the Montana Code.

As can be seen from a review of the foregoing decisions, as well as statutes, a sharing of profits is universally required as an element in a mining partnership. Some states do not require an express agreement, but imply such an agreement emanating from the relationship. The "Code" states of California and Montana, as well as Idaho and Nevada (not discussed herein) generally reflect the common law and specifically provide that a member of the mining partnership shares in profits and losses in proportion to the ownership interest held by that member.

3. It is recognized that under 11 U.S.C. § 1107, BRC, as a debtor-in-possession, has the same rights and responsibilities as a trustee in certain respects. Thus, the action here is on behalf of BRC and its creditors. While the action is deemed to be on behalf of all creditors general-

■ In the face of this authority, I am persuaded that New Mexico, if called upon to rule on the specific question, would confirm that there are three essential elements to the existence of a mining partnership. These elements are a presently-held joint ownership interest in mining property; second, there must be some form of joint operation of the mining activity; and third, there must be an agreement, at least by implication, to share profits. The sharing of losses is implied from the existence of the relationship.

■ It then becomes necessary to examine the facts in this case, to see if the elements of a mining partnership exist. Further, these facts should be viewed in light of the status of the litigants, i.e., as original parties to the purported partnership.[3]

### Joint Ownership

The elements of joint ownership and joint cooperation are really interwoven constituents of a mining partnership and should be considered together. However, some discussion of each is in order, to develop and apply law to the facts herein.

■ While co-ownership of a mineral interest is indispensable, that interest need not necessarily be in fee. *Maguire v. Lees*, 74 Cal.App.2d 697, 169 P.2d 411 (1946); Brimmer, *Mining Partnerships, supra*. An equitable interest in the mine is sufficient. *Gilbert v. Fontaine, supra, Harper v. Sloan*, 177 Cal. 174, 169 P. 1043 (1917); *Meister v. Farrow*, 109 Mont. 1, 92 P.2d 753 (1939); *Manville v. Parks*, 7 Colo. 128, 2 P. 212 (1883); *New Amsterdam Cas. Co. v. Harrington*, 11 S.W.2d 533 (Tex.Civ. App.1928). A presently vested leasehold interest will also suffice. 4 *Summers, supra*, § 722, at 276–277.

ly, this does not foreclose the possibility that certain creditors may have peculiar circumstances which might need to be addressed in individual cases in the future with regard to establishment of a mining partnership.

■ Whatever ownership interest is established, it is clear that such interest must be held *in praesenti*. *Shell Petroleum Corp. v. Caudle*, 63 F.2d 296 (5th Cir.1933); *Meister v. Farrow, supra.*

BRC argues that both it and LILCO had the necessary ownership interest in the Marquez Property, pointing to the assignment of leases, the dedication provisions and take-over rights in the agreements in support of this contention. BRC refers to other "valuable rights" which were granted by the agreements to LILCO by way of various options and rights of first refusal as additional support for BRC's contentions. It is then argued that in New Mexico an assignment for security purposes is an "interest in real property." *Hernandez v. SIC Finance Co.*, 79 N.M. 673, 448 P.2d 474 (1968).

■ However, it must also be borne in mind that under New Mexico law an assignment of property for purposes of establishing a security interest in that property still leaves the assignor as the "beneficial" owner of the property. *Audio Visual Marketing Corp. v. Omni Corp.*, 545 F.2d 715 (10th Cir.1976).

The New Mexico authorities discussing mining partnerships do not define the type of interest that will or will not qualify as joint ownership. *Daily v. Fitzgerald, supra*, did not address the issue directly, since the agreement there was acknowledged by the parties to be a partnership interest of some sort for the working of a mine.

It has been held in several other jurisdictions that the creation of a security interest is an insufficient indicia of ownership to satisfy this requirement of a mining partnership. *Smith v. Rampy*, 198 S.W.2d 592 (Tex.Civ.App.1946); *Treat v. Murdock, supra; Bueche v. Charles E. Conner Co.*, 10 Utah 2d 301, 352 P.2d 266 (1960); American Law of Mining, Article 1 of Ch. I and Ch. II of Title XXII, and §§ 23.1, 23.3, 23.5, 23.7 and 23.9 of Title XXIII. Further, an option to purchase or otherwise acquire additional interests in property has been held to be

insufficient. *Lakeview Drilling Co., Inc. v. Stark*, 210 Or. 306, 310 P.2d 627 (1957).

A contract providing for a stated portion of production, as opposed to a specific interest in the leasehold, has likewise been held to fall short of a mining partnership relation. *Sims v. Humble Oil & Refining Co.*, 252 S.W. 1083 (Tex.Civ.App.1923); *Bueche v. Conner, supra.*

■ An agreement to purchase goods or services in a mining operation does not qualify as an "ownership" interest for purposes of a mining partnership. *Edwards v. Hardwick*, 350 P.2d 495 (Okl.1960) [also printed in 12 O & G R 684]; *J. Robert Neal, Inc. v. McElveen*, 320 S.W.2d 36 (Tex.Civ.App.1959).

Finally, contingent interests which vest upon the happening of a certain contingency have been held not to constitute a mining partnership. *Southard v. Oil Equipment Corp.*, 296 P.2d 780 (Okl.1956).

An examination of the documents and facts established by the evidence here demonstrates that the basic agreement in 1976 called for the *purchase* by LILCO ("Buyer") from BRC ("Seller") of five million pounds of $U_3O_8$. A purchase price was set forth, along with a delivery schedule. A purchase-price security deposit was then provided under Article 4 of the 1976 UCPC. Title to the uranium concentrates passed under Article 6 of the agreement to LILCO "after unloading at the point of destination." These are all words of purchase and sale, and are descriptive of a buyer-seller relationship.

LILCO was to be repaid this security deposit by deductions from its purchase price payments, under Article 7. The Agreement did not specifically address how repayment would be treated in the absence of sufficient production to accomplish return of the investment, other than in the *"force majeure"* section to the contract. It is clear the parties otherwise contemplated that the entire security deposit should be returned through production. Under Article 11, *"Force Majeure"*, if either party was unable to perform as a result of a

condition of *force majeure*, the contract could be terminated in accordance with terms expressed therein, "provided, Buyer shall be entitled to immediately receive from Seller the balance of the Purchase Price Security Deposit remaining outstanding at such time." The foregoing added elements of borrower-lender to the relationship.

As security to "assure Buyer of its ability to secure delivery hereunder and to receive the appropriate purchase price credits which will guarantee the return of the Purchase Price Security Deposit, Seller agrees" to assign its leasehold interests to LILCO, as "Buyer" to secure performance by BRC. Further, BRC agreed to dedicate all leasehold interests to the fulfillment of its contract obligations to LILCO. These, too, are words of lender-borrower, and do not evince a co-ownership or mining partnership relation.

I find that the substance of the relation between these parties is consistent with the form, as expressed in the contracts. The contract provisions relating to dedication, the assignment of leases and the take-over rights on default or "material breach" were all for the purpose of establishing and maintaining a security interest in LILCO. The options and rights of first refusal were additional consideration for LILCO to enter into the agreements, and offered additional security to insure a long-term supply of uranium. Such provisions are perfectly compatible with the relationship of borrower-lender or buyer-seller.

There can be no doubt LILCO was interested in securing a long-term source of uranium, for which it was willing to advance funds to insure the development of the mine and milling project. It is also clear that if BRC became successful in its toll milling project, LILCO would like the additional advantage of an opportunity to

participate in that success. Thus, the provision for warrants to purchase BRC stock at a fixed price were made part of the Mine and Mill Financing Agreement.

LILCO perhaps flirted with broadening its position to that of a joint venturer [4] by its extensive interest and participation, but to so hold would be an unwarranted extension of its true interest and position in this instance.

The purchase price security deposit provided for under the 1976 UCPC was required by BRC to fulfill its contract requirements to LILCO and to enable BRC to pay on its obligations, get the mine underway and search for further uranium to sell to LILCO as well as to others. Repayment under that agreement was not contingent on production. Security interests were required by LILCO to guard against the payment of upfront monies without assurances of future deliveries. I am reluctant to go out on a limb and specifically conclude what the relationship was. It could be a hybrid of buyer-seller and lender-borrower. What I do conclude is that the relationship between LILCO and BRC, in the context in which it is analyzed in this instance, did not involve the indicia of co-ownership necessary to establish a mining partnership resulting from the 1976 UCPC.

I also find and conclude, from the facts and authorities contained herein, that under the 1978 agreements LILCO was a lender and a purchaser but not an equity investor, and not a mining partner. It is not LILCO's normal business to be a banker for mining or other ventures of non-related companies. However, here, LILCO saw the opportunity to assure itself of a needed source of energy to supply electricity to its consumers by advancing funds to provide BRC with the opportunity to build the mill and develop further mining operations. No evidence has been presented to

---

**4.** The distinction between a mining partnership and a joint venture, which is commonly defined as an association of persons who combine property, knowledge, and efforts to carry out a single business venture for a profit, has been questioned by some authorities. Groves, "Co-Ownership of Mining Property", 2 R.Mt.Min.L.Inst. 277

(1956); Brimmer, *Mining Partnerships, supra.* However, it appears that a joint venture might exist short of establishing joint ownership. A mining partnership cannot exist without satisfying this requirement. Such distinction is unnecessary to discuss here, since I find neither to exist in this case.

establish that the funds advanced by LIL-CO under these circumstances are prohibited by the ordinary nature of LILCO's operations or by any laws under which it operates or by which it is regulated. LILCO could, presumably, have embarked upon its quest for long-term sources of energy by expanding into the area itself, by a joint venture or a partnership with another, or by advancing funds on a loan basis to an expert in the energy field who would then contract to provide production to LILCO. These are but a few of the alternatives LILCO could have considered. It appears to me that LILCO chose the latter.

In return for the advancement of extensive funds for BRC's use as capital, LILCO extracted some rather tight security provisions and controls. It agreed in the 1978 CSC to lend an additional $13,000,000 as an advance deposit on the purchase of 4 million pounds of uranium. This was an interim financing arrangement while BRC obtained stockholder and Public Service Commission approval of the Mine and Mill Financing Agreement. I have previously set forth my finding that the Mine and Mill Financing Agreement was, in reality, just what it said it was—a loan. Nothing contained therein casts LILCO in any role of "ownership." The 1978 CSC became part of the new loan under the 1978 UCPC, which is the agreement whereby LILCO agreed to purchase further uranium under terms exhaustively set forth therein. That agreement appears under the evidence thus far to still be in effect, and makes LILCO a purchaser of uranium from BRC, with further security provisions to satisfy LILCO's then-perceived needs for uranium and to secure its "investment." That investment did not, under the authorities as I construe them, create a condition of joint ownership in the operation so as to qualify LILCO as a "mining partner."

### Joint Operation

The lack of joint ownership should render further discussion of a mining partnership moot. However, since this will likely not be the court of last resort on the sub-

ject, I shall move to the elements of joint operation and sharing of profits.

Co-ownership establishes nothing unless there is cooperation in mining operations. Brimmer, *Mining Partnerships, supra;* Fiske, *Mining Partnership, supra;* see, also *Treat v. Murdock, supra; Harper v. Sloan, supra; Lyman v. Schwartz, supra; Meister v. Farrow, supra; Skillman v. Lachman, supra.*

It is not necessary that there be individual participation in actually working the mine. *Meister v. Farrow, supra; Treat v. Murdock, supra; Harper v. Sloan, supra; Lyman v. Schwartz, supra;* 4 *American Law of Mining,* Ch. II, "Mining Partnerships", § 22.30 (1969).

There have been numerous situations where one party furnishes the labor while another supplies funds. See, e.g., *Harper v. Sloan, supra, Bently v. Brossard, supra; Lyman v. Schwartz, supra; Meister v. Farrow, supra.*

Merely furnishing advice in the operation of a mine has also been held sufficient. *Mud Control Laboratories v. Covey, supra;* Fiske, *Mining Partnership, supra.* Indeed, merely possessing the right to exercise such functions as direction and management may, under some circumstances, establish the necessary cooperation in operations. (Id.) See, *Mud Control Laboratories v. Covey, supra; Treat v. Murdock, supra;* Fiske, *Mining Partnership, supra.*

The issue of control or supervision, as evidenced by the right to be kept informed of progress or to receive periodic data and logs, and to approve or disapprove of various activity in the mining operation, has been the subject of several cases struggling with the question of joint operation. See, e.g., *Shell Oil Co. v. Prestidge,* 249 F.2d 413 (9th Cir.1957); *Mud Control Laboratories v. Covey, supra, National Union Oil & Gas Co. v. Richard,* 164 Okl. 13, 22 P.2d 88 (1933).

The essence of the inquiry, it seems to me, should be directed to the purpose for which the purported partner has participated or reserved the right to participate,

as well as the extent of that participation. Certainly, it is not uncommon for secured lenders of money to reserve rights to be kept informed, to approve or disapprove of expenditures and activities, and to exercise some degree of supervision or control, where necessary to preserve the lender's security interest. However, one becomes a mining partner by furnishing capital, as a co-owner of a mining interest, for the purpose of creating a profitable operation, with the expectation of sharing in those profits. In such case, merely furnishing (or retaining the right to furnish) advice regarding the operation, or exercising some direction over certain functions and insisting on being kept informed of progress, with the right to withhold approval of expenditures, is all part of that partnership investment. That is not the situation here.

I have previously found the agreements between LILCO and BRC to be ones whereby LILCO agreed to purchase large quantities of uranium over an extended period of time and to loan BRC sufficient sums to bring its mine, and later a mill, into operation. The mining operation of BRC was to supply uranium to LILCO under its contracts, and also to supply uranium to other entities if sufficient quantities were produced in excess of its obligations to LILCO. In an effort to secure compliance with these contracts, LILCO retained security interests and rights to take over operations in the event of default, along with rights to approve and disapprove certain expenditures from funds it advanced, to be kept informed and to have the right to be consulted on some matters. As a practical matter, the evidence demonstrated that LILCO assiduously admonished its on-site representatives not to interfere or participate in any management functions whatsoever. LILCO's participation was for the purpose of insuring the funds it advanced by way of loans and purchase price security deposits were not dissipated but were prudently utilized to the end that production would be achieved and LILCO's uranium needs fulfilled. Its participation in this context did not make it a "partner" in the mining operation. LILCO was a purchaser of uranium and a lender of funds, who took every precaution to secure the performance of BRC by insisting on security, together with the retention of various rights and options, to insure that BRC's obligations were met.

Parenthetically, it must again be noted that LILCO did retain rights which could, conceivably, result in the participation of profits through the acquisition of warrants and rights of first refusal regarding sales forward to other parties after May 1, 1978. While these interests could, under some circumstances, be construed as a partnership interest, they were, in this instance, part of the consideration for entering into the agreements and to secure performance, all toward the goal of LILCO to acquire a source of supply for its expanded needs for uranium.

This should not be construed to make LILCO a partner in the operation of the mining venture. Further, the evidence previously discussed indicates the true intent of the parties was not one of creating a partnership. See, *Skillman v. Lachman*, 23 Cal. 198 (1863).

In my judgment, the evidence in this matter has failed to demonstrate the necessary joint operation to satisfy the requirement of a mining partnership.

### Sharing Of Profits

I have determined that New Mexico would require an agreement to share profits as essential to the existence of a mining partnership. This profit sharing involves the participation in profits, *as profits*, not as compensation for the use of money, equipment or personal services. *Treat v. Murdock, supra; Seifert v. Brown*, 53 S.W.2d 117 (Tex.Civ.App.1932); *Southern Underwriters v. Gariepy*, 105 S.W.2d 760 (Tex.Civ.App.1937). See, also, Jones, *Mining Partnership in Texas*, 12 Tex.L.Rev. 410 (1934).

Similarly, it has been noted that royalty interests, net profits interests, production payments or payments on a secured debt are not the kind of sharing of profits con-

templated for a mining partnership. See, Fiske, *Mining Partnership, supra*, for a catalog of decisions and articles in this regard.

Here, the only way LILCO would share in any profits is if it chose to purchase BRC stock through LILCO's warrants. LILCO also had the right to convert the note, under conditions of default, to preferred stock. This could, conceivably, have led to participation in profits which might be generated. Until then LILCO did not share in profits. Its rights were limited to acquiring uranium that was produced and which it contracted to purchase, together with interest on its loan to BRC and a commitment fee on that loan under the Mine and Mill Development Financing Agreement. These are not indicative of "profit sharing". Rather, what LILCO was to receive under its agreements with BRC was the right to purchase various quantities of uranium and to expect repayment of its loans.

Accordingly, this element, like the previous two, has not been demonstrated in this case. It is my conclusion that the evidence in this matter has failed to establish any of the elements necessary to the existence of a mining partnership.

II. *Did LILCO engage in conduct toward BRC which constituted economic coercion?*

BRC argues that LILCO undertook a concerted course of conduct toward BRC which placed it in an untenable economic circumstance, with the result that BRC was forced to borrow funds from LILCO under an Agreement containing conditions so onerous that default was inevitable. This alleged action by LILCO forms the basis of BRC's claim of economic duress, for which it seeks damages of at least $55,000,000.

"The charge of economic compulsion, like fraud, is one easily made.". *Terrel v. Duke City Lumber Co., Inc.*, 86 N.Mex. 405, 524 P.2d 1021, 1023 (Ct.App.1974), aff'd in relevant part, 88 N.Mex. 299, 540 P.2d 229 (1975).

■ In New Mexico, economic duress is analyzed as a tort, wherein the plaintiff is required to establish three elements:

1. A duty on the part of the defendant to present the plaintiff with a choice of reasonable bargaining alternatives;

2. That defendant breached that duty;

3. That the breach caused the plaintiff to enter into an unfavorable bargain against his will.

*Electrical Products Co. v. Combined Communications Corp.*, 535 F.Supp. 356 (D.C.N.Mex.1980).

"Each of these elements must be proved by clear and convincing evidence." Id. at p. 360.

The court, in *Electrical Products Co., supra*, went on to analyze the source of the duty of the defendant and what constitutes its breach, stating, at page 360 as follows:

"In an economic duress case, the duty to present reasonable alternatives arises when the defendant stands in a superior bargaining position to the plaintiff. But a mere disparity in size or bargaining power is not sufficient to create this duty; in general, every businessman is free to drive the hardest bargain he can. Only when the defendant holds the power to deal a fatal, or at least a very severe, economic injury to the plaintiff will he be constrained by the law of economic duress from abusing that power. *See, Pecos Construction Co. v. Mortgage Investment Co. of El Paso*, 80 N.M. 680, 459 P.2d 842 (1969); *First National Bank in Clayton v. Wood*, 93 N.M. 467, 601 P.2d 437 (Ct.App.1979); *Terrel v. Duke City Lumber Co.* [86 N.M. 405, 524 P.2d 1021]," Id. at 360.

We must, then, analyze the facts in this case to see if such a duty should be imposed upon LILCO, and whether it was breached, causing damage to BRC.

■ Here, BRC bases its claim on the following: It is contended that after the 1976 UCPC was entered into, it became necessary for BRC to raise funds to construct a mill. LILCO was aware of this need, and in 1977, at BRC's invitation, at-

tended meetings with Stearns-Roger for the construction of such a mill. The price of uranium at this time was rapidly escalating and BRC was anxious to get a mill into operation, both for the purpose of fulfilling its contract with LILCO and of providing toll milling services to others. BRC still appeared financially stable and the future of the uranium industry was promising.

Through the years 1976 and 1977, discussions ensued between BRC and LILCO for the sale of BRC to LILCO. In late 1977, or early 1978, LILCO retained the investment banking firm of Morgan Stanley to advise it regarding this acquisition. LILCO also employed David S. Robertson and Associates to evaluate the Marquez oil reserves and expected mining costs, and engaged the Stoller Corporation to evaluate the uranium market.

During this period of time, Mr. Bokum's adamant testimony is that he could have acquired the necessary funds by selling uranium forward to other customers, but was prevented from doing so by virtue of LILCO's contention that under the 1976 UCPC, BRC could not sell to others until the contract requirements to LILCO were met.

BRC alleges that, thereafter, in the spring of 1978, LILCO devised a plan with the assistance of Morgan Stanley, to advance money to BRC under terms so onerous as to make default inevitable so that LILCO could obtain the mine and mill by default, thus saving anywhere from 35 million to 70 million dollars it would have to pay to BRC shareholders in any sale and purchase of the company. The onerous terms complained of by BRC, in addition to the refusal to allow sales forward, included the refusal of LILCO to include a *force majeure* clause in the Mine and Mill Development Financing Agreement, the imposition of unreasonable time requirements for completion and production, and unreasonably restrictive provisions relating to cost overruns. Additionally, there was the element of alleged control over BRC by LILCO resulting from the 1978 agreements. BRC's position is that all of these factors in combination constituted economic coercion, resulting in the destruction of BRC as a viable business entity.

The evidence here reflects that, although Mr. Bokum repeatedly stated in his testimony that representatives of LILCO wrongfully contended he could not sell uranium forward, this testimony was vigorously disputed by Mr. Boylan, the former Vice President of purchasing and inventory control for LILCO. Boylan stated that LILCO simply insisted that commitments to it be fulfilled by BRC before BRC made any *deliveries* to third parties. The evidence fails to disclose a single sale that was prevented as a result of this controversy. Mr. Bokum indicated that he realized litigation might be necessary to release pounds in the ground for sale to others. Thus, Mr. Bokum recognized litigation as one of his alternatives.

It is also relevant that Mr. Bokum testified the alleged LILCO contention was not the reason he was unable to sell the company. Bokum had endeavored to explore the sale of BRC to other entities as early as 1974 and 1975 when he tried to sell the company to a French utility company on the same terms offered to LILCO. This company refused those terms. Negotiations then were conducted with the French, Italian and Spanish Governments, without favorable results. In late 1976 and into 1977 correspondence or discussions took place with a German utility, with Exxon, Chevron, and Union Electric Company. These did not come to fruition, but not because of any action by LILCO. Finally, considerable discussions were conducted with Gulf Oil and Occidental Minerals in 1978, with Gulf Oil contacting BRC as late as 1981 and 1983. The negotiations with Gulf were terminated by BRC in 1978, when the deal was closed with LILCO.

The alternative of raising capital through the sale of BRC stock was also available but was rejected by Mr. Bokum. Loans from other sources, including the Chemical Bank, were explored and only slightly discussed in the evidence. And in any event,

no such loans were arranged and no terms were presented to the Court.

While there is considerable controversy over the question of LILCO's contentions relating to the sale of uranium to third parties, it is my determination from the evidence that BRC has failed in its burden of proof to establish that LILCO made any wrongful contentions preventing BRC from selling uranium forward to third parties. Indeed, Mr. Bokum stated he didn't believe LILCO could prevent him from selling forward in any event. Actually Bokum did make some attempts to sell uranium forward but the evidence fails to reflect that any such efforts were fruitful.

The contention that LILCO extracted unreasonable and onerous terms through its refusal to include a *force majeure* clause in the Mine and Mill Development Financing Agreement is likewise unavailing. The deal with LILCO was closed on December 6, 1978. One flood had already occurred. Neither party apparently wished to undertake responsibility for such conditions. Certainly, LILCO was under no obligation to do so. It had a legal right not to so obligate itself. It chose not to lend the $45,000,000 under the Agreement if it was expected to absorb such responsibility. The alternative to BRC was to not borrow from LILCO, look elsewhere for financing, sell the company or sell stock, or accept responsibility for conditions of *force majeure*, itself. BRC had attempted for a long period of time to sell the company, and LILCO's actions had nothing to do with its inability to consummate such a transaction. The sale of stock was rejected by Mr. Bokum, and the evidence indicates that no one else would lend BRC funds on terms as favorable as LILCO. BRC cannot now complain to the Court that its inability or unwillingness to extract more favorable terms at the bargaining table somehow now constitutes a cause of action against LILCO. See, *Electrical Products Co. of New Mexico, Inc. v. Combined Communications Corporation, supra.*

Similarly, the time requirements for completion and production were not dictated by LILCO. BRC represented at the time of negotiations that such projections could be met. When they were not, LILCO granted extensions of time.

The issue of control of BRC by LILCO under the 1978 agreements must also be resolved against BRC. This is especially so in view of BRC's own disclosures to its shareholders wherein it denied the existence of such control in the absence of a default under the terms of the Financing Agreement. The possibility of default, aside from referring to it in negotiations with LILCO, was hardly addressed by BRC, since it maintained and represented publicly that it was capable of performing under the terms of the agreements.

Finally, BRC contends that LILCO owed a fiduciary obligation to BRC's shareholders and, owing such obligation, should have disclosed its control to the shareholders. I have found that BRC denied the existence of such control to its own shareholders. It also denied, in communication to the S.E.C., offered by BRC's counsel, that it believed any such fiduciary obligations were imposed upon LILCO. I agree with counsel for BRC. Nothing presented in the evidence establishes that LILCO was placed in a position of fiduciary responsibility to the shareholders of BRC.

The evidence here demonstrates hard bargaining by both sides, with give and take by each, resulting in compromises on both sides of the table. No doubt LILCO was the stronger entity economically. That does not, in itself, impose an obligation on LILCO to resist striking its strongest deal—so long as it did not take unfair advantage in the process. The intra-company memos reflect discussion within LILCO of the most harsh positions LILCO could assume. Ultimately, it chose not to be intractable in its terms, although insistent on its rights. There were no unreasonable bargaining alternatives presented. Indeed, BRC explored many. Those which failed were not the result of LILCO's conduct. Those alternatives BRC chose not to pursue (i.e., sale of stock) were at all times available and undiminished by anything

LILCO may have said or done. Alternative negotiations with others were terminated by BRC when it voluntarily closed its deal with LILCO on December 6, 1978.

The foregoing is a simplistic resume of two weeks of trial, but suffice it to say that in my judgment the evidence falls far short of demonstrating economic duress, whether the burden of proof be by clear and convincing evidence or by a preponderance of the evidence. It did not occur under the applicable legal standards.

Accordingly, BRC's claim of economic duress must fail.

III. *Should the monies advanced by LILCO to BRC be treated as equity rather than debt and be subject to equitable subordination?*

The funds advanced by LILCO were in two forms. First, there were two purchase-price security deposits (1976 UCPC, 1978 UCPC), totalling $28,000,000. Second, LILCO advanced funds pursuant to the loan under the Mine and Mill Development Financing Agreement, in a principal amount of $45,000,000.

BRC argues that the security deposits, as well as the loan for the mill, should be treated as contributions to equity rather than debt owed to LILCO. This would, in effect, result in subordinating LILCO's claims to one extent or another, to those of other creditors and place it on par with BRC's shareholders. See, *In re Simpson*, 222 F.Supp. 904 (M.D.N.C.1963). BRC also states that this argument is an alternative to its claim of a mining partnership and that a ruling in its favor under either point will yield essentially the same result. That is questionable, since under mining partnership principles, LILCO may be responsible to creditors of BRC. That issue has not been discussed in this opinion, and the question of a mining partnership has not been addressed in the context of third-party litigation or the rights of third-party creditors. Equitable subordination, which may be imposed by a bankruptcy court under 11 U.S.C. § 510(c), involves no resultant third party liability, although claims may be subordinated to other claims or allowed interests subordinated to other allowed interests, depending upon individual circumstances. Sen.Rpt. No. 95–989, 95th Cong., 2nd Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

LILCO points out that only the 1978 loan is at issue in the foreclosure suit, which is the basis for any claim which might be the subject of equitable subordination.

Pursuasive arguments are set forth by BRC in support of its position. However, most of the authorities cited are tax cases, wherein transactions are examined to determine the proper tax treatment for transactions between the taxpayer and a purported borrower. Usually these involved transactions between a corporation and a major shareholder. Examination by the bankruptcy court is for a different purpose and utilizes different criteria. See, *In re Rego Crescent Corp.*, 23 B.R. 958 (Bkrtcy. E.D.N.Y.1982). As the court observed in *In re Rego, supra,* whether or not a taxpayer owes the I.R.S. has no bearing on whether a purported borrower owes the taxpayer, stating as follows:

"Clearly, the legal questions and policy considerations under that determination are so removed from determining whether money advanced should be considered capital contributions or loans for bankruptcy purposes that those cases are in no way relevant to the inquiry before this court." Id. at 962.

The critical inquiry in characterizing the transaction of the parties in a bankruptcy context is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated. See, *In re Rego, supra; In re Bellucci,* 24 B.R. 493 (Bkrtcy.Mass.1982); *In re Mobile Steel Company,* 563 F.2d 692 (5th Cir.1977); Sen.Rpt. No. 95–989, 95th Cong., 2nd Sess. 74 (1978).

Nonetheless, the criteria raised by BRC and some of the cases cited in support of its position deserve discussion.

It is observed that courts have looked to whether funds advanced are for capital assets, also denominated as "core assets".

*Plantation Patterns, Inc. v. CIR,* 462 F.2d 712 (5th Cir.1972); *Scriptomatic, Inc. v. United States,* 397 F.Supp. 753 (E.D.Pa. 1975), whether the funds are risk capital for a new business, *Fin Hay Realty Co. v. United States,* 398 F.2d 694 (3rd Cir.1968); *Covey Investment Company v. United States,* 377 F.2d 403 (10th Cir.1967); *Gannett Co. v. Larry,* 221 F.2d 269 (2nd Cir. 1955); or whether original capital is inadequate to finance the business, creating an inordinately high debt to equity ratio. *John Kelley Co. v. CIR,* 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946); *International Telephone & Tel. Corp. v. Holton,* 247 F.2d 178 (4th Cir.1957); *S.E.C. v. Liberty Baking Corp.,* 240 F.2d 511 (2nd Cir. 1957).

 BRC urges that LILCO's advances were to enable BRC to acquire the initial assets necessary to its operation, without which "there could be no production, no sales, no business." *Scriptomatic, Inc., supra,* at page 762. Further, it is contended that although BRC had been in operation as a uranium exploration company, its involvement with LILCO required BRC to expand its activities into a production-oriented mining company. This was a "new business" for BRC, which involved incurring substantial debt with little equity, making initial operations of BRC very thinly capitalized. These are all factors considered by the courts, especially in tax cases, in resolving issues of risk capital versus debt. They are not dispositive.

Two bankruptcy decisions cited by BRC should be reviewed. *In re Simpson, supra,* imposed equitable subordination after finding a joint venture between a mortgage company (lender) and a contractor (borrower). The court then eliminated the security interest held by the mortgage company and subordinated its claim to materialmen but not to the claims of general creditors. Here, I have determined from the evidence that there was not a joint venture and that the motives of the parties still left, in the context in which this matter must be viewed, a purchaser-seller, lender-borrower relationship.

*Gannett v. Larry, supra,* is also inapposite in that, there, the Gannett newspaper chain *purchased* a company which manufactured paper products. Gannett then financed its new acquisition to convert the company's operations into the production of newsprint for Gannett's use. This whole transaction was the result of a newsprint shortage which had been experienced in the industry. When this shortage abated, the subsidiary company experienced economic hardship and petitioned for bankruptcy. Gannett's claim was subordinated because the bankrupt company had really been Gannett's subordinate subsidiary, created solely to service Gannett and wholly subject to Gannett's direction. Such was not the case between BRC and LILCO, as has already been exhaustively reviewed herein.

BRC then maintains that where repayment is dependent upon the success of the venture for which funds are advanced, those funds should be treated as equity. *Austin Village, Inc. v. United States,* 432 F.2d 741 (6th Cir.1970); *J.S. Biritz Construction Co. v. CIR,* 387 F.2d 451 (8th Cir.1967). However, as previously noted, repayment to LILCO was nowhere conditioned upon the success of BRC. Indeed, various measures were provided as security for performance, including foreclosure rights. Those foreclosure rights are what LILCO is seeking to enforce in the underlying litigation. Further, there is nothing unusual in a lender supplying funds to its borrower for initial operations, perhaps for the acquisition of capital assets, expecting repayment from earnings in the venture, all of which is dependent upon the success of the venture, and for which the lender takes backs a security interest to insure performance.

I must also direct some observations to BRC's argument that a factor which emphasizes that LILCO's investment was at the risk of the venture is LILCO's "knowledge" that its advances for mill construction "were not secured, but would be subordinate to lien creditors." (Posttrial Brief of Bokum Resources Corporation, page 39).

In support of this contention, BRC cites to the trial transcript, Vol. III, pp. 422–425 and to Exhibit 233. A review of that transcript reveals the cited pages were discussions between the Court and counsel relating to an objection by counsel for LILCO to proposed testimony. The objection was sustained and no admissible evidence is contained within the cited pages. Presumably, the cited pages are offered for the legal argument they contain and I have considered the transcript in that context. What emerges is the contention that LILCO's lawyers learned that under New Mexico law materialmen and laborers who provide material or services at the mill after LILCO advanced funds for the construction of the mill would have claims for their services superior to LILCO's security. This is alleged to be so because the mill construction was commenced prior to the advances by LILCO. The cited Exhibit, No. 233, is an opinion letter dated December 4, 1978 to LILCO from its Salt Lake City counsel. This opinion letter does not support any reference to the legal analysis contended by BRC. However, it does postulate that the mortgage granted by BRC to LILCO is probably unenforceable and advises that BRC has an indefeasible mineral leasehold, subject only to the Permitted Encumbrances set forth in Art. XV of the 1978 UCPC. One of the eleven Permitted Encumbrances is "[L]iens securing mechanics, materialmen, carriers, warehousemen, landlord to the extent imposed by law, abstracters, and other similar persons; ..." It matters not whether LILCO knew its advances might be subordinate to subsequent mechanics' liens, since, if that is so, any lender's rights would be subject to such legal ramifications. This does not detract from its status as a lender.

Next, BRC claims if advances are made while the debtor corporation is operating at a loss, such funds may be treated as equity. See, *Diamond Brothers Co. v. CIR*, 322 F.2d 725 (3rd Cir.1963). However, the need for funds is not infrequently the cause of seeking a loan. Thus, this factor, without a great deal more, is totally unpersuasive.

Finally, it is BRC's contention that the objectively manifested intent of the parties was to create an investment. Under such circumstances, some courts have held the funds advanced may be treated as equity. *J.S. Biritz, supra; L & M Realty Corp. v. Leo*, 249 F.2d 668 (4th Cir.1957).

There is considerable evidence to support the contention that even representatives and advisors of LILCO regarded the funds advanced as constituting some form of "investment" and establishing "an equity relationship ... from a practical standpoint," .... See, e.g., Exhibit B–82; Exhibits 319, 334, 374. LILCO's general counsel characterized the transaction with BRC as "an investment in a uranium venture." Exhibit 285. The deposition of Mr. O'Brien, LILCO's Senior Vice President for Finance, reflects his opinion that the "debt money represented a form of equity." (O'Brien deposition, p. 74). Further, the fact that provisions were made in the contract for allowing LILCO to participate in profits through warrants used to purchase BRC stock is supportive of this intention.

All of the foregoing factors are matters to be considered in resolving whether LILCO's position, even in the bankruptcy context, is one of an equity investor or that of a lender whose claim should fall into place along with all others. However, the principles of equitable subordination in bankruptcy are not generally applied unless the holder of the claim is guilty of "inequitable conduct." *In re Rego Crescent Corp., supra; In re Bellucci, supra; In re Mobile Steel Co., supra*, Sen.Rpt. No. 95–989, *supra*. It does not appear such conduct is limited to egregious matters such as fraud, but contemplates conduct making it inequitable to allow all of the claims or interest in the chain of distribution as compared to other allowed claims or interests.

I cannot find such inequitable conduct from the evidence, as presented by these two parties. Further, while the factors cited by BRC are certainly matters to be considered, even in bankruptcy litigation, I find and conclude that under the totality of

the evidence, the advances made by LILCO did not remove it from the status of a lender of funds and a purchaser of uranium. It was not an equity investor as that determination must be resolved within the setting of this bankruptcy litigation.

Accordingly, the claim of BRC that LILCO's financing was risk capital, which should be considered as equity rather than debt, is resolved in favor of LILCO.

### IV. *Did LILCO defraud BRC?*

BRC has asserted a claim of fraud based upon the failure of LILCO to disclose that it allegedly controlled BRC and that it owed fiduciary duties to BRC and its shareholders.

This issue has been adequately discussed previously herein, with the result that I have found LILCO did not control BRC and did not owe fiduciary duties to BRC or its shareholders. LILCO was required to deal fairly but it was not required to forebear from negotiating from a position of strength, as discussed under the issue of economic coercion.

The basic elements of fraud are clearly set forth in *Pacific Royalty Co. v. Williams,* 227 F.2d 49 (10th Cir.1955), cert. den. 351 U.S. 951, 76 S.Ct. 847, 100 L.Ed. 1474 (1956). Those elements are as follows:

1. False representation of a material fact;

2. Knowledge of its falsity when made;

3. Intent to deceive;

4. Reliance by the party defrauded;

5. Damages resulting from the fraud.

Fraud requires clear and convincing evidence. *Pacific Royalty Co. v. Williams, supra; Hockett v. Winks,* 82 N.M. 597, 485 P.2d 353 (1971).

Based upon the evidence previously discussed herein, there is a total failure of proof with respect to any of the foregoing elements of fraud.

### CONCLUSION

Having reviewed the evidence in this matter at great length and having considered the applicable legal standards, it is my determination that Counts II, III and IV of the Amended Counterclaim should be dismissed, and that Judgment should enter on these counterclaims in favor of Long Island Lighting Company.